**Rosemary FOSTER, Appellant,**

v.

**COLORADO RADIO CORPORATION,**
**a corporation, Appellee.**

**No. 8689.**

United States Court of Appeals
Tenth Circuit.

July 6, 1967.

**224**

Charles C. Spann, of Grantham, Spann, Sanchez & Rager, Albuquerque, N. M., for appellant.

Stanley C. Sager, of Menig & Sager, Albuquerque, N. M., for appellee.

Before MURRAH, Chief Judge, HICKEY, Circuit Judge, and CHRISTENSEN, District Judge.

MURRAH, Chief Judge.

Colorado Radio Corporation brings this diversity suit for damages resulting from Mrs. Foster's alleged breach of promise to purchase certain of the assets of a New Mexico radio station. On trial to the court Colorado Radio prevailed, and Mrs. Foster appeals raising questions concerning breach and the proper measure of damages, if any. We affirm with modification.

On the breach issue Mrs. Foster first disputes the court's finding that she breached the contract on the ground that the contract provision requiring her to "make satisfactory arrangements" for the payment of two notes she was to assume established a condition precedent to her duty to purchase. The contention is that satisfactory arrangements were not made, and this being so there could be no breach. We think it sufficient to say that the responsibility for making arrangements was placed by the contract on Mrs. Foster, and that with respect to one of the notes the evidence falls far short of showing a reasonably diligent effort on her part to make arrangements. A party may not raise nonperformance of a condition as a bar to liability where his own inaction is the cause of the nonperformance. See Gibbs, v. Whelan, 56 N. M. 38, 239 P.2d 727.

Mrs. Foster also attacks the finding of breach on the theory that no "demand of performance" as required by Sec. 50–7–3, N.M.Stat., 1953,[1] was made by Colorado Radio prior to initiation of this suit. The contention is that if no demand was made, the contract could not be "converted into a money demand". The trial court found "That notice was given to * * * [Mrs. Foster], demanding that [she] perform the said contract, but that [she] failed to do so and [was] entirely in default." This finding was based on uncontroverted evidence that Mrs. Foster failed to make application to the Federal Communications Commission for transfer of the radio license as she was required to do under the contract,[2] and that Colorado

---

1. *Contracts not specifying time of performance—Demand necessary.*—Except as provided in the Uniform Commercial Code [50A–1–101 to 50A–9–507], no contract for labor, or for the payment or delivery of property in which the time of performance is not fixed, can be converted into a money demand until a demand of performance has been made and the maker refuses or a reasonable time is allowed for performance."

2. "The Buyer [Mrs. Foster] shall file the necessary application for transfer of the License to operate with the Federal Communications Commission and each party shall use all diligence possible in procuring the transfer of the License and shall cooperate and file such documents as are necessary. * * *

"In the event permission to transfer License to operate Station not be obtained from the Federal Communications Commission on or before Nine (9) months from the date of filing without outstanding protest or litigation in con-

Radio sent her a telegram on November 18, 1964, (about two weeks before suit was filed) stating that "Our Washington, D. C., attorneys advise your FCC application required by our agreement dated 28 August, 1964, is still not ready for filing. Our material was ready in early September. * * * We demand you use all diligence possible in preparation of application. Attorneys say five more days is reasonable. * * *" The record also contains transcriptions of two telephone calls made after the wire was sent in which Colorado Radio sought to find out if and when Mrs. Foster was going to file the application. Mrs. Foster concedes that a demand that she file the application was made, but argues that the statute required Colorado Radio to go further and demand payment of the contract price before initiation of suit. We find nothing in the statute and no case is cited which requires such a further demand.

■ The manifest purpose of 50–7–3 is to give a party one last chance to perform his contract obligations prior to suit. Here transfer of the license was clearly a condition precedent to Mrs. Foster's duty to purchase, but she had failed to even file an application for transfer. By demanding that she file the application Colorado Radio was insisting that she take the first step necessary to an orderly performance of her obligations, and we think this is what the statute envisions in the context of our case.

We turn then to the matter of damages. Shortly after suit was filed Colorado Radio negotiated a private resale of the station to one Walton. The trial court found that the resale covered the same items sold under the Foster Contract. It was stipulated at the trial that, aside from incidental damages, " * * * the measure of damages is the difference between the resale price and the contract price * * *". Applying this formula the court granted an award of $15,750, plus $500 attorney's fees as incidental damages. No complaint is made of the award of attorney's fees.

Mrs. Foster first contests the court's award on the theory that since Colorado Radio admittedly did not give notice of the intended resale, it is barred by Secs. 50A–2–706(1) and (3), N.M.Stat., 1953,[3] from recovering the contract price less the resale price. These provisions, part of the Uniform Commercial Code, permit a seller of goods to utilize the contract price less resale price remedy, but require reasonable notice to the buyer where the intended resale is to be private. There is no contention by Colorado Radio that consideration of this issue is foreclosed by the stipulation. The parties thus interpreted the stipulation to mean that if Colorado Radio properly resold, its damages were to be computed on the basis of the resale price.

■ The trial court concluded that "The contract * * * did not fall within the Uniform Commercial Code." The apparent basis for this conclusion, and the reasoning which Colorado here offers in support of it, is that the subject matter of this contract is not "goods" and therefore this sale contract was not governed by Article 2 of the Code. We agree that the evidence is clearly sufficient to support a finding that the license, good will, real estate, studios and transmission equipment were not movables and hence not "goods"

---

nection with said transfer, this Agreement shall become null and void, and all parties hereto shall be released from any further obligations hereunder."

3. *"Seller's resale including contract for resale.*—(1) Under the conditions stated in Section 2–703 [50A–2–703] on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reason-

able manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this article (section 2–710 [50A–2–710], but less expense saved in consequence of the buyer's breach."

"(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell."

within the meaning of Secs. 50A–2–105 (1) and 50A–2–107(2), N.M.Stat., 1953.[4]

It is conceded by Colorado Radio, however, that the remaining assets sold under the contract, i. e., office equipment and furnishings, were movables. As to these "goods" Colorado Radio argues that their sale was incidental to the contract's main purpose of transferring the station as a going concern, and therefore citing Epstein v. Giannattasio, 25 Conn. Sup. 109, 197 A.2d 342, the Code should not apply to their sale. We cannot agree. We find nothing in the pertinent Code provisions or comments to indicate that it is not to apply to all sales of goods. Instead we think that the clear language of Sec. 50A–2–102 to the effect that "Unless the context otherwise requires, this article applies to transactions in goods * * *", makes Article 2 and specifically Sec. 50A–2–706(3) applicable to the sale of these goods. The Epstein case is, we think, distinguishable on its facts. It involved the sale of beauty services, during the course of which a product was applied to the purchaser of the service. The question was whether the use of the beauty product constituted a sale of goods so as to bring the action within the warranty sections of the Code. The court held that there was no sale of goods on the theory that the predominant feature of the transaction was the sale of the service. But, in our case there was no sale of a service but instead the sale of a group of assets, some of which are non-goods but others of which concededly are statutory goods. The principle of

the Epstein case is thus inapplicable. Nor do we think that because the primary purpose of the parties was to transfer the station as a going concern, the Code should not apply to the goods that were sold as part of the deal. It happens in this case that the uncontradicted testimony is to the effect that the value of the goods constituted some five to ten per cent of the contract price.[5] It is quite conceivable, however, that a business could be sold in which all the assets aside from good will would be goods. Nonapplication of the Code to the sale of goods in such a case, and in our case, is we think, plainly contrary to the intention of the drafters.

But, what we have said does not require a reversal in toto. We see no reason not to view the Foster contract in two parts as effecting the sale of goods and non-goods. As to the former, since no notice of resale was given, the remedy provided by 50A–2–706 may not be utilized. And since the parties stipulated that contract price less resale price was to be the measure of damages, if any, the breach of promise to purchase the goods is unremediable. As to the nongoods notice of intent to resell was not mandatory; there is no contention that the resale price was not reasonable, i. e., see 5 Williston on Contracts, revised edition, Sec. 1379C, and the stipulated remedy may be properly utilized. Taking the undisputed testimony most favorably to Mrs. Foster, i. e., that the value of the goods was ten per cent of the value of all the assets sold, it is

4. "50A–2–105. Definitions—Transferability—"Goods"—"Future Goods"—"Lot"—"Commercial Unit." (1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 2–107 [50A–2–107])."

"50A–2–107. Goods to be severed from realty—Recording.—(2) A contract for the sale apart from the land of growing crops or other things attached to realty and capable of severance without material harm thereto but not described in subsection (1) is a contract for the sale of goods within this article whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance."

5. Five to ten per cent of the contract price would be some $12,000 to $25,000.

reasonable to assume that ten per cent of the damage award represented damages for the refusal to purchase the goods. Accordingly the award shall be reduced ten per cent from $15,750 to $14,175, and affirmed since the remaining contentions on damages are resolved against Mrs. Foster.

 Mrs. Foster next suggests that the stipulation was improperly applied. The trial judge, making straight-forward application of the stipulation, computed the net prices under the two contracts, and found the difference to be $15,750. This computation is not directly disputed.[6] Instead Mrs. Foster asks that we go behind the stipulation and determine " * * * whether the apellee, Colorado Radio Corp., was any worse off as a result of [Mrs. Foster's] not having performed." This we decline to do. The parties entered into the stipulation in court, with open eyes, and the trial judge applied it. His computation is clearly supported by the record. We will not permit the stipulation as applied to be subverted at this late date. See Stubblefield et al. v. Johnson-Fagg, Inc., 379 F.2d 270.

Finally, Mrs. Foster argues that the Escrow provision [7] of the contract provided for liquidated damages of $5,000 in the event of breach, and that this was the limit of her liability. Judge Payne found this provision ambiguous, and admitted the Escrow Agreement [8] itself to resolve the ambiguity. He found that the $5,000 amount was not intended to be the limit of liability, and Mrs. Foster attacks this finding on the theory that since the Escrow Agreement was not attached to the complaint as required by Rule 9(k) of the New Mexico Rules of Civil Procedure, 21–1–1(9)(k), N.M.Stat., 1953,[9] the Escrow Agreement should not have been admitted.

 It is sufficient to say that this was not a suit based on the Escrow Agreement, but was instead a suit for damages under the contract. Thus, Rule 9(k) in no way operated as a bar to admission of the Escrow Agreement. This Agreement was clearly admissible to aid the court in ascertaining the intention of the parties as to whether the Escrow provision was meant to be Colorado Radio's exclusive remedy in case of breach, cf. Ryder Truck Rental, Inc.

6. By indirection Mrs. Foster does seem to object to two elements in the court's computation of the Walton net contract price. First, she seems to dispute the finding that the real estate was sold to Walton. The Walton contract contained a provision for leasing the real estate, but the court admitted extrinsic evidence which uncontrovertedly showed that this lease provision was put in the contract by mistake, and that the real estate had been sold under the Walton contract just as it had been included in the Foster contract. Secondly, Mrs. Foster seems to dispute the court's finding that a portion of the Walton price was precomputed interest to be deducted from the gross price in determining the net price. The Walton contract does not spell this out, but again uncontroverted extrinsic evidence fully supports the court's determination. In any event we are satisfied that the court's computation of the two net contract prices is clearly correct.

7. "The parties shall enter into a Trust Escrow Agreement and Buyers shall pay the sum of Five Thousand ($5,000.00)

Dollars as good faith money to escrow * * * said sum to be paid over to the Seller should Buyers fail to close within 10 days after the notification of the approval of this sale by the Federal Communications Commission or should a default occur under other provisions of this contract. * * * "

8. The Escrow Agreement specifically provided that "The payment of this fund, shall not be considered as a limit of damages recoverable by the Seller nor limit any other of his legal remedies."

9. "(K) *Written Instruments Referred To—Copies To Be Filed.* When any instrument of writing upon which the action or defense is founded is referred to in the pleadings, the original or a copy thereof shall be filed with the pleading, if within the power or control of the party wishing to use the same, and if such original or a copy thereof be not filed as herein required, or a sufficient reason given for failure to do so, such instrument of writing shall not be admitted in evidence upon the trial."

v. National Packing Co., Inc., 380 F.2d 328, and the court's finding that it was not intended to be exclusive is clearly correct.

The judgment, as modified, is affirmed.