117 N.J. Super. 353 (1971)
284 A.2d 568
HUYLER PAPER STOCK COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
INFORMATION SUPPLIES CORPORATION, A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided November 24, 1971.
*355 Mr. Joseph R. De Miglio for plaintiff (Messrs. Marotta and De Miglio, attorneys).
Mr. John Dolan Harrington for defendant (Messrs. Winne & Banta, attorneys).
GELMAN, J.J. & D.R. Ct. (temporarily assigned).
This action for breach of contract was tried before the court and jury, resulting in a verdict in favor of the plaintiff in the sum of $3,264. At the conclusion of plaintiff's case defendant moved for a dismissal of the complaint on the ground that the contract, not being in writing, was not enforceable *356 under section 2-201 of the Uniform Commercial Code, N.J.S.A. 12A:2-201.[*] Decision on defendant's motion was reserved and the factual issues were submitted to the jury for its determination. Pursuant to R. 4:40-2(a) and for the reasons hereinafter set forth, the court herewith grants defendant's motion to dismiss and directs the entry of judgment thereon.
Accepting as true the testimony of plaintiff's witnesses and all inferences which could reasonably be drawn therefrom, the jury could have found the following facts at the conclusion of plaintiff's case: Plaintiff is engaged in the purchase and sale of paper waste and scrap. It purchases paper waste from a variety of customers, including charitable organizations as well as industrial and commercial accounts. It maintains trucks which it employs to collect the waste and, in the case of industrial and commercial accounts, its trucks make pickups at regular intervals or when called by the account. The waste thus collected is sorted and re-baled at plaintiff's plant and resold to others who process the paper for re-use. The business in which it is engaged is highly competitive and it is not customary in the trade to have written contracts with the accounts from whom paper waste is purchased. In the normal course of business both the seller of the waste and plaintiff are free to terminate their relationship at any time. The price which plaintiff pays to its accounts for waste is determined from time to time from quotations set forth in a trade journal, and purchase invoices are sent to the accounts at the end of each month showing the amount collected, the price and the balance due to the account.
Defendant is engaged in the business of processing data information cards. A substantial quantity of paper scrap is generated as a result of the processing work. In 1967 defendant moved from New York to a new plant in Carlstadt. *357 Plaintiff's officers learned that defendant had relocated in New Jersey, and Anthony D'Elia called upon defendant's plant manager, Jack Osmet, to solicit the purchase of defendant's waste. An agreement was reached between Osmet and D'Elia whereby defendant did sell its waste to plaintiff for a few months during 1968. The agreement was oral and was terminable at any time by either party. The arrangement was, in fact, terminated by defendant, who received a more favorable price from one of plaintiff's competitors.
In February or early March 1969 Osmet contacted D'Elia concerning problems defendant was having in the disposition of its paper waste, and there was a preliminary discussion between them concerning the installation of a paper baling press at defendant's plant. D'Elia reported this conversation to his brother, Emil D'Elia, who was plaintiff's president. In early March a meeting was held at defendant's plant, attended by Osmet, Emil D'Elia and Joseph D'Elia, the latter being an officer of plaintiff but not actively associated with the business. According to Emil and Joseph D'Elia, an oral agreement was reached at this meeting, the terms of which were as follows: plaintiff would purchase and install a paper baling press at defendant's plant, and defendant would pay for the baler at the rate of $100 a month in the form of a credit to plaintiff against the sales price of the waste which defendant would sell to plaintiff each month. In consideration of plaintiff's agreement to install the baler and to accept payment in monthly installments, defendant agreed to sell all of its paper waste to plaintiff for a period of two years from the time the baler was installed. The selling price for the waste was to be determined on the basis of trade journal quotations in effect at the end of each month.
On March 12, 1969 plaintiff resumed collection of defendant's paper waste and submitted purchase invoices for the quantity collected through May 19, 1969. On or about May 19, 1969 plaintiff purchased a baler which was installed at defendant's plant, the total purchase price and installation *358 charge being $1,493.50. Plaintiff continued to collect the waste thereafter and submitted purchase invoices each month. Each invoice, which covered several collections, set forth the quantities of different types of waste collected, the purchase price for each category and the total amount due from plaintiff to defendant. From this total $100 was deducted for the baling press, and the current balance due for the baling press appeared on each of the subsequent invoices, beginning with the invoice of June 9, 1969. Plaintiff continued the collection and payment for the waste in this manner through the end of December 1969, after which it received no communications from defendant to pick up waste.
In the early part of January Anthony D'Elia called defendant's plant and was told by Robert Hull, who had replaced Osmet as defendant's plant manager, that plaintiff's "services" were no longer required. As a result of this conversation Emil and Anthony D'Elia went to defendant's plant and met with Hull. Hull iterated that defendant would no longer sell its waste to plaintiff, that it was now selling to another dealer. Emil D'Elia pointed out that plaintiff had installed the baling press on defendant's premises, and Hull told him that if that were the case, he could remove it. The following day Emil D'Elia went to defendant's plant to remove the baling press but he was met by Hull, who advised him that defendant had an interest in the baling press since it had paid a part of the purchase price in the manner described above. Hull said that defendant would pay the balance due on the baling press, and Emil D'Elia left. However, defendant subsequently failed to pay the sum of $593.50, being the balance due on the baling press as disclosed by the last purchase invoice submitted by plaintiff to defendant. Plaintiff thereupon instituted this action to recover damages for defendant's breach of the oral agreement to sell its paper waste to plaintiff for a period of two years from May 19, 1969.
In his opening to the jury defendant's counsel admitted its liability to plaintiff for the sum of $593.50, but otherwise *359 denied the existence of an agreement to sell waste to plaintiff for any fixed term. Defendant's witness Osmet testified that the agreement reached in March 1969 was terminable at any time by either party, and in the event of termination before the full purchase price of the baling press had been paid, defendant's sole responsibility was to pay in one lump sum any unpaid balance.
The section of the Uniform Commercial Code on which defendant relies, N.J.S.A. 12A:2-201, reads in pertinent part as follows:
(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

* * * * * * * *
(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable.

* * * * * * * *
(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or
(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (12A:2-606).
On plaintiff's proofs the following factual conclusions are inescapable: (1) the agreement to be enforced was wholly oral; (2) paper waste constitutes "goods" within the meaning of section 2-201 (see N.J.S.A. 12A:2-105), and (3) the agreement contemplated the sale of goods in excess of $500, inasmuch as the sales for the 32-week period totalled $8,166.50. Hence, unless the contract is otherwise excepted from the operation of section 2-201(1), it is not enforceable.
Plaintiff urges that the agreement is not governed by section 2-201 because the contract was to supply services *360 rather than for the sale of goods. There are no New Jersey cases on point, but decisions elsewhere have held that the statute of frauds section of the Uniform Commercial Code, like its predecessor section of the Sales Act (former N.J.S.A. 46:30-10), applies only to the sale of goods and not services. See Gerber v. Weinstein, 6 N.J. Misc. 284 (Sup. Ct. 1928) (Uniform Sales Act); Stone v. Krylon, Inc., 141 F. Supp. 785 (D.C. Pa. 1956) (Uniform Commercial Code). While the contract here does contain an element of a service contract, i.e., the collection of the waste by plaintiff, the principal object of the agreement was the sale of the waste by defendant to plaintiff. No separate charge was made by plaintiff for any service which was rendered, and the collection service was but a necessary incident to the sale and not the essence of the agreement. This is further borne out by the fact that plaintiff in this action sought recovery for its loss of profit resulting from the defendant's refusal to sell waste to it for the balance of the term of the agreement.
Next, it is contended that the requirements of the Code were met by the partial performance of the agreement over a period of 32 weeks, as well as by plaintiff's delivery of the baling press in accordance with the terms of the agreement. See, e.g., Schnoll v. Dutt, 128 N.J.L. 475 (Sup. Ct. 1942) (Uniform Sales Act). The difficulty with this position, however, is that the Code parted company with the Sales Act statute of frauds in this respect, and partial performance of an agreement does not avoid the requirement of a writing under section 2-201 but renders the agreement enforceable only with respect to the goods which have been delivered and accepted. See Abrams, "Introduction and New Jersey History of the Uniform Commercial Code," 17 Rutgers L. Rev. 1, 22 (1962); Williston, "The Law of Sales in the Proposed Uniform Commercial Code," 63 Harv. L. Rev. 561, 575 (1950).
While there have been no reported New Jersey decisions to date on this point, two decisions from other jurisdictions *361 illustrate the impact of the change made by section 2-201. In Spiering v. Fairmount Foods, Inc., 424 F.2d 337 (7 Cir.1970), plaintiff sued on an oral contract with defendant whereby the latter had agreed to sell milk to plaintiff at a special discount price for as long as plaintiff remained a milk vendor. The agreement had been performed by both parties for a period of approximately eight months when defendant notified plaintiff that it would no longer receive the special price. In holding that partial performance did not satisfy section 2-201, the court noted that under this section
* * * a contract is taken out of the statute only as to goods `which have been received and accepted.' [at 340]
In Bagby Land & Cattle Co. v. California Livestock Commission Co., 439 F.2d 315 (5 Cir.1971), plaintiff, a dealer in cattle, had delivered 222 head of cattle to defendant pursuant to an oral contract to sell defendant a total of 2,000 head. Defendant had not paid for 80 of the cattle delivered, and plaintiff sued for the purchase price. Defendant counterclaimed for plaintiff's breach of the agreement to deliver the remaining 1,778 cattle. The court held that plaintiff was entitled to recover the purchase price for all cattle delivered and accepted by defendant and dismissed the counterclaim as being barred by section 2-201. The court stated:
Under § 2.201(c)(3) of the Texas Business and Commerce Code an otherwise invalid contract `is enforceable * * * (3) with respect to goods * * * which have been received and accepted.' Although we have found and are cited to no Texas cases interpreting this recently adopted legislation, we have no hesitancy in holding that the effect of this statute is to validate an oral agreement only as to these goods actually received and accepted by the buyer. While the UCC Comments on this section are not final authority, we treat them as authoritative support for this holding, particularly in the absence of other precedents:
2. `Partial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted.
Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that *362 a contract actually exists. If the court can make a just apportionment, therefore, the agreed price of any goods actually delivered can be recovered without a writing or, if the price has been paid, the seller can be forced to deliver an apportionable part of the goods. * * *
[Defendant's] acceptance of 222 cattle delivered pursuant to the alleged contract does not, therefore, give rise to the right to have delivery of any other cattle for which it orally contracted. Section 2.201(c)(3) does not sustain the contention made. [at 317]
In the case at bar performance of an agreement for the sale of goods over a period of 32 weeks was admitted. Likewise, defendant admitted its agreement to purchase and pay for the baling press which was delivered by plaintiff and accepted by it. Under section 2-201 the oral contract is enforceable only to the extent that performance has occurred prior to the breach, and plaintiff cannot recover damages for any goods which were to be delivered in the future but wrongfully withheld.
Finally, it is urged that the requirement of the writing was met in this case through plaintiff's purchase invoices which reflected all the terms of the contract with the exception of its duration. Since section 2-201 does not require that all of the terms of the agreement be in writing, it is said that the time period of the contract may be established by parol evidence and the agreement is therefore enforceable. See N.J.S.A. 12A-2-202(b). Unquestionably, the draftsman of the Code intended to and did relax the Sales Act requirement that all terms of the contract be in writing. See New Jersey Study Comment, Uniform Commercial Code, N.J.S.A. 12A:2-201. Likewise, it would appear that a purchase invoice may constitute a writing sufficient to satisfy the statute. Cf. Azevedo v. Minister, 471 P.2d 661 (Nev. Sup. Ct. 1970). However, under section 2-201, the agreement is enforceable only to the extent of the goods shown in the writing which is relied upon to establish the contract, and hence the purchase invoices, even if they are deemed to meet the statutory requirement of a writing, cannot support a claim for damages for future *363 goods. Beyond that, the invoices here were authored by plaintiff and none of the invoices contain the signature of defendant  the party to be charged  which still remains an essential requirement under the statute of frauds section of the Code.
An order for judgment may be submitted.
NOTES
[*] The defense of the statute of frauds had been raised in the answer and was the subject of a motion for summary judgment made prior to trial, which motion had been denied.