WILLIAM G. BURTON *v.* ARTERY COMPANY,
INC. ET AL.

[No. 82, September Term, 1976.]

*Decided January 6, 1977.*

The cause was argued before SINGLEY, SMITH, DIGGES, ELDRIDGE and ORTH, JJ.

*Robert H. Haslinger,* with whom was *Samuel Gordon* on the brief, for appellant.

*Peter R. Hartogensis,* with whom were *Wheeler & Korpeck* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

We are here presented with the question of whether the applicable statute of limitations to a contract for the sale and installation of a number of trees and shrubs and the sale and placing of a substantial amount of sod is the three year provision in Maryland Code (1974) § 5-101 Courts and Judicial Proceedings Article as to civil actions generally or the four year statute in Code (1957, 1964 Repl. Vol.) Art. 95B, § 2-725 (1) (now, without change, Code (1975) § 2-725 (1) Commercial Law Article) relative to actions "for breach of any contract for sale . . . ." We conclude that this case is properly governed by the latter (Uniform Commercial Code or UCC). Thus, we shall reverse the judgment entered by a trial judge on a motion for summary judgment. We granted certiorari prior to consideration of this matter by the Court of Special Appeals.

Appellant, William G. Burton t/a William Burton Nurseries (Burton), sued Artery Company, Inc., said to be the successor by merger to Artery Communities, Inc. (Artery), and The Artery Organization, Inc., alleged to own all of the stock of Artery Communities, Inc., and to have managed its affairs, claiming nonpayment of a substantial sum due him under a contract dated April 12, 1971. Suit was not filed until April 23, 1975, more than three years but less than four years after the alleged due date under the contract, December 31, 1971.

The contract specified that it was for "Prospect Walk II," said to have been a construction project at Columbia in

Howard County. In the contract Artery was described as "Contractor" and Burton, as "Subcontractor." It is upon what appears to be a standard form between a building contractor and a subcontractor, with a number of paragraphs eliminated. Schedule A of the contract, appended to it, set forth the scope of the work as to "furnish, supply, provide and deliver all labor, supervision, tools, equipment, plant material and perform all the work and services required for the completion of the landscaping and sod at Prospect Walk II, Columbia, Maryland (92 units — 13 buildings)." The "work and services" were to be performed and the materials supplied "in accordance with the Contractor's applicable plans, specifications furnished by Kenneth P. Soergel and all local governing codes." Plants and trees were to be guaranteed for a period of one year from the date of installation. Ground cover and flowers were "to be planted as per plans." Sod was to meet the standards of the State of Maryland "and all local governing codes," with "20% maximum weed content." The area in which sod was placed was to be "fine grade[d] to ± 2/10 foot." It was to "be rolled immediately after installation and watered once, as soon as possible, after the rolling procedure." At the model site covered in the contract Burton was to set out 18 azaleas of one size, 10 azaleas of a somewhat larger size, and 9 rhododendrons of a specified size. He was to install six trees of three specified varieties, provide certain land cover, and place sod. At the remaining sites a total of 235 trees of five different varieties and certain specified sizes were to be placed together with 420 shrubs in addition to the placement of sod. The trial judge determined "the contract in question [to be] a 'services' contract to which the Statute of Limitations of the Uniform Commercial Code does not apply."

1 J. Poe *Pleading and Practice* § 618 (5th ed. Tiffany 1925) states that "the plea of limitations seems always to have been regarded as almost an odious defense, and has never been favored by the courts." Poe then refers to "the universal [Maryland] practice [of] requir[ing] it to be specially pleaded in all actions except ejectment, and to be

filed by the rule day," as now required by Maryland Rules 342 c 1 (d), 342 c 2 (a), and 342 d 2. Because our holding here conceivably can have a bearing on other applications of the UCC to contracts such as this, we dare not rest our decision upon the narrow ground that since limitations are not favored we should opt for the less stringent provision.

## I

The term "goods" is defined in UCC § 2-105 (1):

"(1) *'Goods'* means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Title 8) and things in action. 'Goods', also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (§ 2-107)." (Emphasis in original.)

The official comment states in pertinent part as to § 2-105:

"Growing crops are included within the definition of goods since they are frequently intended for sale. The concept of 'industrial' growing crops has been abandoned, for under modern practices fruit, perennial hay, *nursery stock* and the like must be brought within the scope of this Title." (Emphasis added.)

The sod, trees, and shrubs here involved obviously are goods to be severed from realty. The UCC in § 2-107 states in pertinent part:

"(1) A contract for the sale of timber, minerals or the like or a structure or its materials to be removed from realty is a contract for the sale of goods within this title if they are to be severed by the seller . . . .

"(2) A contract for the sale apart from the land

of growing crops or other things attached to realty and capable of severance without material harm thereto but not described in subsection (1) is a contract for the sale of goods within this title whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance.

"(3) . . ."

The admonition in UCC § 1-102 (1) is that "Titles 1 through 10 . . . shall be liberally construed and applied to promote its underlying purposes and policies." We have heretofore referred to this statement in *Harris v. Bower*, 266 Md. 579, 588, 295 A. 2d 870 (1972), and *Plemens v. Didde-Glaser*, 244 Md. 556, 562, 224 A. 2d. 464 (1966).

In *Barron v. Edwards*, 45 Mich. App. 210, 206 N.W.2d 508 (1973), the court was faced with the question of whether sod was personalty and thus governed by the UCC or realty to which the statute of frauds would be applicable. There was an oral agreement to sell sod. The seller began a suit to restrain the buyer from removing the sod after the state highway department condemned his farm. To the buyer's counterclaim he presented the defense that the contract covered an interest in land and therefore was unenforceable since it was not reduced to writing. The court referred to the official comment to § 2-105 which we have previously quoted. It found support for its ultimate decision in *Groth v. Stillson*, 20 Mich. App. 704, 174 N.W.2d 596 (1969), where Christmas trees were held to be growing crops, and *Azevedo v. Minister*, 86 Nev. 576, 581, 471 P. 2d 661 (1970), holding hay to be within the meaning of growing crops. The court said:

"Here the sod owed its existence to yearly fertilizing and cultivation by man. It is also significant that plaintiff raised this sod on several prior occasions and apparently treated it as a commercial product. Thus, this sod cannot be

considered 'growing grass' as the plaintiff contends. We therefore hold that the sod in the instant case was personalty." *Id.* at 214.

Many years ago Chief Judge McSherry pointed out for this Court in *Leonard v. Medford*, 85 Md. 666, 671, 37 A. 365 (1897), that "[i]n Maryland, Massachusetts, Maine, Kentucky and Connecticut, sales of growing trees to be presently cut and removed by the vendee are held not to be within the operation of the fourth section of the Statute of Frauds." He referred to the opinion by Chief Judge Le Grand in *Smith v. Bryan*, 5 Md. 141 (1853), which he said "established the law in Maryland to be that a parol sale of growing timber is not within the fourth section of the Statute of Frauds . . . ." The sale in question was determined to be a sale of goods prior to the enactment in Maryland of the Uniform Sales Act.

Sod farms and nurseries are often tremendous commercial enterprises. With the present language of the UCC (including the statement that the sales article should be liberally construed), the official comment, the Michigan decision relative to sod, and the determination by our predecessors that the sale of standing timber was not the sale of an interest in land but one of personalty, we conclude that the sod, trees, and shrubs here involved are goods within the meaning of the UCC.

## II

The four year statute of limitations in § 2-725 is applicable to "[a]n action for breach of any contract for sale . . . ." Accordingly, the question arises as to whether an action to recover sums due for sales is "[a]n action for breach of any contract for sale." The answer is clearly provided in § 2-709 relative to an action for the price. The fact that it has been necessary in some instances for courts to speak on the subject, however, would indicate that all litigants have not understood this fact. The parties here do not dispute that an action for the price is an action for breach of the contract for sale.

Pennsylvania was one of the first states to adopt the UCC. For that reason its early opinions under the Code have been examined for guidance. The present question was before the court in *Gimbel Bros., Inc. v. Cohen*, 46 D. & C. 2d 747, 91 Montg. Co. L. R. 156 (Pa. 1969). In that case a department store started an action to recover the price of clothing sold on credit. The last purchase was made more than four years but less than six years before suit was instituted. The general statute of limitations in effect in Pennsylvania for actions of debt was six years. The court reasoned:

"First of all, it is quite apparent that the clothing which Mrs. Cohen purchased comes within the definition of 'goods' found in section 2-105 (1) of the code. Secondly, each purchase and delivery created a 'contract for sale' as that term is defined in section 2-106 (1). Each time Mrs. Cohen received an article of clothing, she promised to pay the price placed upon it by Gimbels. Her failure to do so amounted to a breach of the 'contract for sale' she had entered into with Gimbels.

"The sole remedy afforded by the code when a buyer fails to make payment for his purchases is an 'Action for the Price' as defined in section 2-709.\* Therefore, plaintiff's suit is, in effect, a series of section 2-709 'Actions for the Price' of goods. Section 2-709 is found in part 7, art. 2, of the code. In this same part of the code, which is entitled 'Remedies,' appears section 2-725 setting forth the four-year-statute of limitations. The inclusion of both sections in the 'Remedies' portion of the code clearly indicates that the limitation contained in section 2-725 is to be imposed upon a seller's action under section 2-709.

"There is another factor which suggests the applicability of the code in matters of this type. If a seller delivers an article which turns out to be defectively manufactured, the buyer can file suit or counterclaim for a breach of warranty under section 2-714. This remedy, however, is limited by

the statute of limitations found in section 2-725. Thus, if Mrs. Cohen had purchased a vacuum cleaner which functioned improperly and damaged her furniture, she might well have refused to pay for it. If she had permitted four years to go by, she would now be without a cause of action. Nevertheless, if a suit brought by Gimbels to recover the unpaid price of the vacuum cleaner were considered to be an 'action of debt' carrying with it a six-year-statute of limitations, Gimbels could recover the price and be immune to any counterclaim by Mrs. Cohen. Obviously, fairness can exist only if the same statute limits actions brought by both buyer and seller.

"* This section provides: 'When the buyer fails to pay the price as it becomes due the seller may recover ... the price (a) of goods accepted. . . .' " *Id.* at 749-50.

To the same effect *see City of Kingsport v. SCM Corporation*, 352 F. Supp. 288, 289 (E.D. Tenn. 1972); *Hachten v. Stewart*, 42 Cal. App. 3d Supp. 1, 116 Cal. Rptr. 631, 632 (App. Dept., Super. Ct., Los Angeles Co. 1974); *Reiss v. Pacific Steel Pool Corp.*, 73 Misc. 2d 78, 341 N.Y.S.2d 364, 365 (S. Ct., Spec. Term, Albany Co. 1973); and *Wilson v. Browning Arms Company*, 501 S.W.2d 705, 706 (Tex. Civ. App., 14th Dist. 1973). Such holdings are in accord with the comment in 1 W. Hawkland, *A Transactional Guide to the Uniform Commercial Code* § 1.5201 (1964):

"Under the U.S.A., actions for breach of the sales contract are governed by the contract statute of limitations which, in most states, is six years. Subsection 2-725 (1) shortens this period to four years, apparently under a theory that gives high value to commercial finality. Sellers and buyers must keep their records during the period of the statute of limitations to be able to resist claims that may be made against them. One of the principal merits of a statute of limitations is that it permits the parties to destroy old records. The draftsmen of the Code seem to have had this fact in mind in

reducing the period of limitations from six to four years." *Id.* at 271.

We hold that a suit to recover sums due for the sale of goods is a suit for breach of a contract of sale and, accordingly, the four year period of limitations in § 2-725 (1) would be applicable if the contract here in question is one covered by the UCC.

### III

Citing *Epstein v. Giannattasio*, 25 Conn. Sup. 109, 197 A. 2d 342 (1963), 1 R. Anderson, *Uniform Commercial Code* § 2-105:10, at 229 (2d ed. 1970), states, "Article 2 does not apply to 'service' contracts nor to materials used or supplied in connection with the performance of such contracts. On this basis it has been held that a beauty treatment is a service contract and that material used in the course of the treatment is not subject to Article 2." In that case the court said, "as the complaint allege[d], the plaintiff asked Giannattasio for a beauty treatment, and not for the purchase of goods. From such language, it could not be inferred that it was the intention of either party that the transaction be a transaction in goods within the meaning of the code." The cases cited there relative to the service of food in restaurants as service rather than a sale are in line with the holding of our predecessors in *Dining Hall v. Swingler*, 173 Md. 490, 197 A. 105 (1938).

*Perlmutter v. Beth David Hosp.*, 308 N. Y. 100, 123 N.E.2d 792 (1954), has been described as the leading case denying warranty coverage to the recipient of blood. The theory of the case there was that the service function predominated and the transaction was thus not a sale of blood within the meaning of the Uniform Sales Act. R. Nordstrom, *Law of Sales* § 22, at 46 (1970), criticizes this and similar holdings with the comment that "courts have on·occasion lost sight of the purpose of the scope section [(§ 2-105)] and have read the definition of 'goods' as approaching a string of meaningless words." This approach has been criticized by others. *See, e.g.,* Comment, *Sales and Service Warranties in*

*Blood Transfusions*, 26 Md. L. Rev. 182 (1966); D. Murray, *Under the Spreading Analogy of Article 2 of the Uniform Commercial Code*, 39 Fordham L. Rev. 447, 464-472 (1971); and F. Miller, *A "Sale of Goods" as a Prerequisite for Warranty Protection*, 24 Bus. Lawy. 847, 849 (1969). Murray and Miller each regard the preferable approach to be that in *Jackson v. Muhlenberg Hosp., et al.*, 96 N. J. Super. 314, 232 A. 2d 879 (Law Div. 1967), *rev'd on other grounds*, 53 N. J. 138, 249 A. 2d 65 (1969).[1] Murray also approves of the somewhat similar holding in *Hoffman v. Misericordia H. of Phila.*, 439 Pa. 501, 267 A. 2d 867 (1970). In *Jackson* the court said:

"The Uniform Commercial Code in *N.J.S.* 12A:2-314 (1), has put to rest the widely criticized holding of *Nisky v. Childs Co.*, 103 *N.J.L.* 464, 50 *A.L.R.* 227 (*E. & A.* 1927), that the serving of food or drink in a restaurant amounts to a 'service' and not a 'sale' and bears no warranty of wholesomeness. See also *Sofman v. Denham Food Service, Inc.*, 37 *N.J.* 304 (1962), especially the concurring opinion of Justice Schettino.

"The rule that food served in a restaurant was not impliedly warranted to be fit for human consumption although food sold in a store was so warranted, had no support in modern concepts of justice. It was an anachronism. It is unthinkable that such a legalism should be revived to avoid holding hospitals and blood banks liable. If these valuable organizations are to be exempted from liability, the immunity should be based upon the true policy consideration and not upon an

---

1. Maryland Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.) Art. 43, § 136B, provides as to the virus of serum hepatitis, what was involved in *Jackson*, that "neither strict liability in tort nor the implied warranties of merchantability and fitness shall be applicable to the procurement, [etc.] . . . and/or use of whole blood [etc.] . . . for the use of injecting or transfusing the same . . . into the human body for any purpose whatsoever."

irrelevant circumstance. See *Collopy v. Newark Eye and Ear Infirmary*, 27 *N.J.* 29 (1958); *N.J.S.* 2A:53A-7 to 10, inclusive.

"The transfer of human blood for a consideration is a sale. So is its transfusion into the body of a patient when a charge is made for the blood." *Id.* at 323-24.

J. White and R. Sommers, *Uniform Commercial Code* § 2-2, at 44 (1972), also states that § 2-201 "does not apply to the rendering of services for a price," citing *National Historic Shrines Foundation, Inc. v. Dali*, 4 UCC Rep. Serv. 71 (N.Y. S. Ct., N.Y. Co., Spec. Term 1967). That case involved an oral agreement by an artist to paint a picture on a television program, which he estimated would be worth $25,000 when completed, and to donate the painting to a non-profit corporation for sale to the public. The court found this to be a contract for rendition of services and not a contract of sale. Other cases holding contracts to be service contracts not within the purview of the UCC include: *St. Luke's Hospital v. Schmaltz*, 534 P. 2d 781 (Colo. 1975), involving a blood transfusion where the patient contracted serum hepatitis as a result of defective blood which was furnished. The court said:

"We disagree with the court of appeals and believe the more realistic view of the relationship between a hospital and a patient is not that of a commercial transaction involving a seller and a buyer, wherein a quantity of blood is sold for a price, but rather that the essence of the hospital-patient relationship is one in which '* * * the patient bargains for, and the hospital agrees to make available, the human skill and physical material of medical science [whole blood for transfusion purposes] to the end that the patient's health may be restored,' as expressed in Perlmutter v. Beth David Hospital, *supra*, and the numerous cases which follow it." *Id.* at 784.

*Robertson v. Ceola,* 255 Ark. 703, 501 S.W.2d 764 (1973), involved an oral contract for the purchase and installation of certain materials during the construction of a home. The court said:

> "Even though it be said that the material appellee was to purchase and furnished constitutes goods within the definition of § 85-2-105 and part of appellee's profit is to be gained on cost plus 15% on the material, nevertheless, the essence of the agreement is a service contract for appellee to install tile in appellant's home. Unless the principal object of the agreement is for sale of goods, then § 85-2-201 is inapplicable. See *Huyler Paper Stock Co. v. Information Supplier Corp.,* 117 N.J. Super. 353, 284 A. 2d 568 (1971)." *Id.* at 705.

In *Schenectady Steel Co. v. Bruno Trimpoli, etc.,* 43 A.D.2d 234, 350 N.Y.S.2d 920 (S. Ct., App. Div., 3d Dept.), *aff'd,* 34 N.Y.2d 939, 316 N.E.2d 875, 359 N.Y.S.2d 560 (1974), the contract was one to furnish and erect structural steel. The court said:

> "In our opinion the Uniform Commercial Code was not applicable here. The Code applies to transactions involving goods, but its provisions, as with its predecessor, the Uniform Sales Act, are not applicable to either 'service' or 'construction' contracts (1 Anderson, Uniform Commercial Code, [2d ed.], §§ 2-102:5, 2-105:10 and 2-105:11; see N.Y. Law Rev. Comm. Report [1955], Vol. 1, p. 361.)

> "If service predominates and the transfer of title to personal property is an incidental feature of the transaction, the contract does not fall within the ambit of the Code, as it did not fall within the ambit of the Sales Act (Perlmutter v. Beth David Hosp., 308 N.Y. 100, 104-105, 123 N.E.2d 792, 793-794; Ben Constr. Corp. v. Ventre, 23 A.D.2d 44, 257 N.Y.S.2d 988). And the contract in the instant case was a contract for the rendition of services, a

work, labor and materials contract, rather than a
contract for the sale of goods, the steel beams
involved. Upon an examination of the contractual
terms, appellant was obligated to 'furnish and erect
the structural steel,' and the objective of the parties
was, therefore, clearly to secure the erection of the
structural steel for the bridge. Respondent was not
contracting simply for the steel beams but in
essence for their erection and installation with the
transfer of the title to the steel a mere incident of
the overall transaction, a mere accessory to the
work and labor to be performed (see Perlmutter v.
Beth David Hosp., *supra*; Ben Constr. Corp. v.
Ventre, *supra*)." *Id.* at 922-23.

In its affirmance the New York Court of Appeals said "that
on the facts of [that] case it [was] immaterial whether
article 2 of the Uniform Commercial Code applie[d]." *Suchy
v. Stuerzel*, 82 Misc. 2d 40, 370 N.Y.S.2d 316 (S. Ct., App. T.,
1st Dept. 1975), involved a contract with a funeral parlor.
The court said, "The essence of the contractual relationship
between the plaintiff and defendants is one in which service
predominates and the furnishing of a casket was but an
incidental feature of the transaction. Thus, the transaction
is not a sale within the ambit of the Uniform Commercial
Code . . . but one for services." (Citing cases.)

Contracts involving elements of sale and service are
discussed by A. Squillante and J. Fonseca, *Williston on Sales*
§ 5-6 (4th ed. 1973):

"Whether or not a sale or a service has taken
place depends upon the view of the particular
jurisdiction. However, the better view and the more
current one is that the more liberal view of the
Code is to be followed. Where a transaction has
ingredients of both a sale and a service it would
seem best to treat the transaction neither as a sale
nor as a service but rather to develop each portion
within the applicable law concerning that portion in
the individual jurisdiction. Recently one court

dispensed with the early line of thought and extended itself to the more liberal view. [(The authors indicate by footnote that they refer to *Newmark v. Gimbel's, Inc.*, 54 N. J. 585, 258 A. 2d 697 (1969).)] A situation aroŝe wherein the plaintiff received a hair treatment at a beauty parlor at which several hair cosmetics were used. One of the cosmetics caused serious injury to the plaintiff's scalp. The court called this transaction a hybrid transaction partaking of incidents of a sale and of a service. 'It was really partly the rendering of services and partly the supply of goods for a consideration.' The rationale of the court was that if the beauty parlor operator had bought and applied the permanent wave solution to her own hair and suffered injury thereby, she would have had an action against the manufacturer-seller of the product because the basic transaction would have arisen from the conventional sale. Consequently, it does not make sense to deny a similar right to a patron against the beauty parlor operator or the manufacturer when the purchase and sale were made in anticipation and for the purpose of use of the product on the patron who should be ultimately charged for its use. Common sense would seem to dictate that such a patron would be deemed to be a consumer as to both the manufacturer and the beauty parlor operator." *Id.* at 104-05.

One approach that has been used in unraveling contracts which involve both services and goods is that used in *Foster v. Colorado Radio Corporation*, 381 F. 2d 222 (10th Cir. 1967). This was a suit for breach of contract to purchase certain assets of a radio station. The trial court concluded the contract did not fall within the UCC, apparently, as the appellate court said, because "the subject matter of [the] contract [was] not 'goods' and therefore this sale contract was not governed by Article 2 of the Code." It was pointed out on appeal that "the evidence [was] clearly sufficient to

support a finding that the license, good will, real estate, studios and transmission equipment were not movables and hence not 'goods' within the meaning of [§§ 2-105 (1) and 2-107 (2) of the UCC]." Citing *Epstein v. Giannattasio, supra,* it was argued that although the remaining assets sold under the contract, *i.e.,* office equipment and furnishings, were movable, their sale was incidental to the contract's main purpose of transferring the station as a going concern and that, therefore, the UCC should not apply to their sale. The court elected "to view the Foster contract in two parts as effecting the sale of goods and non-goods." It made its award accordingly. This and other cases were reviewed and analyzed in Comment, *Dual Nature Contracts and the Uniform Commercial Code,* 28 Md. L. Rev. 136 (1968). *Foster* is criticized somewhat on a number of grounds in Comment, *Commercial Law-Uniform Commercial Code — Sale of Goods,* 8 Nat. Resources J. 176 (1968). One ground of criticism was that application of the concept of *Foster* might bring a situation where there would be two different statutes of limitation applicable to a single contract.

A test to be used in determining whether a sales contract including service is or is not under the coverage of the UCC was enunciated in *Bonebrake v. Cox,* 499 F. 2d 951 (8th Cir. 1974). The contract there was for the delivery and installation of used bowling equipment. Citing *Aluminum Company of America v. Electro Flo Corp.,* 451 F. 2d 1115 (10th Cir. 1971); *Warner Motors, Inc. v. Chrysler Motors Corp.,* 5 UCC Rep. 365 (U.S. D. Ct. E.D. Pa. 1968); and *Port City Construction Co., Inc. v. Henderson,* 48 Ala. App. 639, 266 So. 2d 896 (1972), the court said that "the fact that the contract 'involved substantial amounts of labor' does not remove it from inclusion under the Code on the ground, as the special Master found that 'The code was [not] meant to cover * * * non-divisible mixed contracts of this type.'" It then went on to state:

"[T]he cases presenting mixed contracts of this type are legion. The test for inclusion or exclusion is not whether they are mixed, but, granting that they are

mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.*, installation of a water heater in a bathroom). The contract before us, construed in accordance with the applicable standards of the Code, is not excluded therefrom because it is 'mixed,' and moreover, is clearly for the replacement of equipment destroyed by fire, *i.e.* 'goods' as defined by the Code." *Id.* at 960.

In *Aluminum Company of America* (Alcoa) suit was brought on an open account for goods sold and delivered to Electro Flo. It counterclaimed for breach of warranty. Alcoa argued on appeal "that the transaction should be characterized as one for professional engineering and design services rather than as a sale of goods, and that there is no implied warranty as to such professional services." The particular contract concerned a collapsible, electrified floor that carnival companies could transport from place to place by trailer and utilize for Whirley Dodge operations. The court "h[e]ld that the transaction between Alcoa and Electro Flo, while it involved some engineering and design aspects, was in essence a sale of goods," and that it "therefore need not decide whether there is an implied warranty in a professional service contract." In *Warner* a dealer agreement between Chrysler and one of its dealers was determined by the court to be "a 'contract for sale' within the meaning of § 2-725 of the Uniform Commercial Code." *Port City* involved an action on a contract to furnish at a given price all concrete slab and, also at a given price, to furnish all labor to pour and finish it. Under the contract the finishing tools were to be provided by Henderson, while "[a]ll grading, forms, polyethylene, wire mesh and expansion joints [were] to be set and furnished by Port City ...." The court "observe[d] that the contract or agreement upon which suit was brought [was] in essence a contract for sale, though including an agreement for work

and labor, as defined by Title 7A, Section 2-106 of the Code. Thus it is subject to be considered and to be controlled by the applicable provisions of the Uniform Commercial Code as adopted in [Alabama]."

Holdings similar to that in *Bonebrake* are found in *Entron, Inc. v. General Cablevision of Palatka*, 435 F. 2d 995, 1000 (5th Cir. 1970) (Contract for construction of a cable television system. The court said, "It seems clear that this contract for the sale of a system, many of the component parts of which were to be manufactured by Entron, was sufficiently a sale of goods as to bring it within the contemplation of the uniform commercial code."); *Cleveland Lumber Company v. Proctor & Schwartz, Inc.*, 397 F. Supp. 1088 (N.D. Ga. 1975) (The court referred to *Meyn v. Ross*, 9 UCC Rep. Serv. 1357 (Pa. Ct. of Common Pleas, Northumberland Co. 1971), where plaintiff sued alleging that the defective installation of copper tubing in a plumbing system caused extensive damage to his home. It then said, "The facts of the *Meyn* case, however, are inapposite to the situation *sub judice*. Whereas there the sale of goods was incidental to the basic purpose of the contract, here, the services involved were incidental to the basic purpose of this contract; the sale of a drying kiln to plaintiff."); *U.S. Fid. & Guar. Co. v. North American Steel Corp.*, 335 So. 2d 18, 21 (Fla. App., 2d Dist. 1976) (There was a contract to furnish, fabricate, and deliver certain steel piping systems for a construction project. The court said, "Since the predomin[ant] nature of the transaction was the furnishing of a product rather than services, we believe that the fabricated pipe could properly be characterized as goods within the meaning of Fla. Stat. § 672.105."); *Berry v. G. D. Searle & Co.*, 56 Ill. 2d 548, 554-55, 309 N.E.2d 550 (1974) (An association argued that it was primarily a service organization which maintained a staff of physicians to give birth-control advice and the dispensation of birth-control pills was only an ancillary adjunct to performing that service, that thus it was merely performing an incidental service in distributing the drugs, and it was not engaged in selling those items as required by the UCC. The court quoted

from *Cunningham v. MacNeal Memorial Hospital*, 47 Ill. 2d 443, 450, 266 N.E.2d 897 (1970), where it stated, "To assert that the transfusion of whole blood by a hospital into a patient, for which a charge is made, does not give rise to implied warranties because no 'sale' is involved is in our judgment simply unrealistic." It then said, "The same conclusion is appropriate in this case."); *INA v. Radiant Electric Co.*, 55 Mich. App. 410, 222 N.W.2d 323 (1974) (A contract involved the installation of electrical wiring. The court said, "Here we have a combination of factors. The services involved the installation of goods supplied by the supplier. The statutory implied warranty applies to the goods being installed. As in *Buckeye* [*Union v. Detroit Edison*, 38 Mich. App. 325, 196 N.W.2d 316 (1972)], the goods being installed were to be used for handling electricity, a dangerous force. We do not hesitate to rule that under such circumstances there is an implied warranty of fitness and merchantability with respect to the manner in which the goods were installed."); *Huyler Paper Stock Co. v. Information Supplies Corp.*, 117 N. J. Super. 353, 284 A. 2d 568, 572 (Law Div. 1971) (The court said, "While the contract here does contain an element of a service contract, *i.e.*, the collection of the waste by plaintiff, the principal object of the agreement was the sale of the waste by defendant to plaintiff. No separate charge was made by plaintiff for any service which was rendered, and the collection service was but a necessary incident to the sale and not the essence of the agreement."); *Worrell v. Barnes*, 87 Nev. 204, 484 P. 2d 573, 576 (1971) (Action by homeowner against contractor for damage to home from fire resulting from leaky gas fitting installed by defendant while remodeling plaintiff's home. The court said that it "must . . . deem this case to involve 'goods' within the purview of the Uniform Commercial Code. NRS 104.2315 and 104.2105(1)."); and *HPS, Inc. v. All Wood Turning Corp.*, 21 N. C. App. 321, 324, 204 S.E.2d 188 (1974) (Contract to install a boiler conversion system. There was a promise that the installed system would permit burning of wood refuse without smoke. The court, without giving reasons, held the transaction was governed by the UCC). To

this list should be added *Pittsburgh-Des Moines Steel v. Brookhaven Manor Wat.*, 532 F. 2d 572, 580 (7th Cir. 1976), where the court took occasion to specifically state that it approved the test enunciated in *Bonebrake* and held the UCC applicable to the sale of a 1-million gallon water tank. It said, "In the present case, while the finished tank was scarcely one to be taken off the shelf, we are unaware of any authority that specially manufactured small dies should be goods and a very large tank not so classified."

Artery relies on *North American Leisure Corp. v. A & B Duplicators, Ltd.*, 468 F. 2d 695 (2d Cir. 1972). The court there took a position not basically inconsistent with *Bonebrake*, stating:

"In determining whether or not a contract is one of sale or to provide services, we must look to the 'essence' of the agreement. When service predominates, the incidental sale of items of personal property, does not alter the basic transaction. Perlmutter v. Beth David Hospital, 308 N.Y. 100, 104, 123 N.E.2d 792 (1954)." *Id.* at 697.

That case involved a contract under which a master tape was forwarded by North American Leisure to A & B Duplicators "to be mastered for an 8-track cartridge, cassette or reel tape. A & B supplied its own tape for the mastering process, cut apart the tape into pieces and put the pieces into cartridges or cassettes which it supplied. A & B then put the cartridges into boxes and the boxes into cellophane wrappers. A & B warehoused the units on its premises and shipped them upon receipt of instructions from [North American Leisure]." The court found A & B Duplicators not to be a seller. In the process it said, "While no cases directly in point have been cited or discovered by our own research, the closest analogy is to publishing cases where the publisher provides a manuscript to a printer who agrees to manufacture books and who supplies the paper, the printing and binding material, the plates and the engravings. In such cases, courts have invariably found the agreement to constitute one of work, labor and services rather than a sale

of books by printer to publisher." However, in *Lake Wales Pub. Co., Inc. v. Florida Visitor, Inc.*, 335 So. 2d 335 (Fla. App. 2d Dist. 1976), the contract was one, as the court put it, "to compile, edit and publish certain pamphlets and other printed materials for the defendants/appellees." The issue was whether the contract was subject to the three year statute of limitations governing unwritten contracts or the four year statute under the UCC. If the contract were one for sale of goods, the four year statute was applicable. The court said:

> "While there is a paucity of cases construing the definition of 'goods' under the U.C.C., the instant case is somewhat analogous to the situation in *Carpel v. Saget Studios, Inc.*, E.D. Pa. 1971, 326 F. Supp. 1331. There, an action for breach of contract was filed against a photographer for his failure to take pictures of the plaintiff's wedding. In determining the correct measure of damages, the court held that the contract breached by the defendant was one for the sale of 'goods.'
>
> "We conclude that production of printed pamphlets and related materials are goods within the meaning of U.C.C. and that appellant's action was therefore governed by the four-year statute of limitations." *Id.* at 336.

The Florida court has correctly cited *Carpel v. Saget Studios, Inc.*, 326 F. Supp. 1331 (E.D. Pa. 1971). The suit there was one for breach of contract to take wedding photographs which "were never delivered because of the negligence and carelessness of the defendant." The court said that the UCC "control[led] the measure of damages for this breach of contract since the sale of photographs would be a sale of goods within Section 2-105."

It is important to bear in mind that § 2-102 says that it is "transactions in goods" to which Title 2 of the UCC is to apply "[u]nless the context otherwise requires," a term said to be broader than the sale of goods. *See, e.g., Skinner v. Tober Foreign Motors, Inc.*, 345 Mass. 429, 187 N.E.2d 669

(1963); *Hertz Com'l Leas. Corp. v. Transportation Cr. Cl. H.,* 59 Misc. 2d 226, 298 N.Y.S.2d 392, 396 (Civ. Ct. of City of N.Y., N.Y. Co., Spec. T. 1969), *rev'd on other grounds,* 64 Misc. 2d 910, 316 N.Y.S.2d 585 (S. Ct., App. T. 1970); and Annot., 17 A.L.R.3d 1010, § 3 (1968). In *Hertz,* after pointing out that the word "transaction" encompasses a far wider area of activity than a "sale," the court said that "it cannot be assumed that the word was carelessly chosen."

Our predecessors in *May Oil Burner Corp. v. Munger,* 159 Md. 605, 152 A. 352 (1930), had before them a contract for the sale and installation of an oil burner. They took occasion in several places in the opinion to refer to the Uniform Sales Act then in force in Maryland notwithstanding the fact that there was an element of service involved. *Engineering & Machine Co. v. Swindell,* 161 Md. 571, 157 A. 763 (1932), concerned a contract for a custom-made bottle making machine. In determining that this was a contract for a sale, and not one for materials and labor only, Judge Offutt observed for the Court:

> "The purpose of that act was to bring about greater uniformity and certainty in the law of sales throughout the United States by reducing its principles to clear, precise and comprehensive rules, and that purpose should not be thwarted by any narrow quibbling or falsely technical construction of its language." *Id.* at 592.

That philosophy is in line with our understanding of the way in which the UCC is to be applied.

We adopt the criteria enunciated in *Bonebrake.* We have already concluded that the trees, shrubs, and sod are goods. Burton is a nurseryman. He is engaged, therefore, in selling trees and shrubs. If he also grows sod, then he is engaged in the business of selling sod. The number of trees and shrubs and the substantial amount of sod here involved make this contract much more nearly analogous to the installation of a water heater in a bathroom than to a contract with an artist for a painting. Thus, the predominant factor here, the

thrust, the purpose, reasonably stated, is a transaction of sale with labor incidentally involved. Therefore, the contract is one governed by the UCC and the four year statute of limitations is applicable.

> *Judgment reversed and case remanded for further proceedings consistent with this opinion; costs to abide the ultimate result.*