E. Lester KIRBY, Individually and trading as Somers-Kirby Motor Company, Plaintiff/Counter-Defendant,

v.

CHRYSLER CORPORATION, Defendant/Counter-Plaintiff.

Civ. A. No. J–80–2919.

United States District Court, D. Maryland.

Dec. 20, 1982.

John A. Wolf, William E. Maseth, Ober, Grimes & Shriver, Baltimore, Md., for plaintiff/counter-defendant.

Fenton L. Martin, Clapp, Somerville, Black & Honemann, Baltimore, Md., for defendant/counter-plaintiff.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Plaintiff, E. Lester Kirby, brought this action under the Court's diversity jurisdiction against defendant, Chrysler Corporation [hereinafter Chrysler], for alleged breaches of direct dealer agreements between the parties. He alleges in Count I that Chrysler delivered to the dealership and charged him for vehicles which he did not order from Chrysler, and in Count II that Chrysler failed to repurchase vehicles it had sold to him within 90 days of the date on which the dealership was terminated. Defendant has counterclaimed for the value of a vehicle which it allegedly repurchased from plaintiff but which has never been returned to Chrysler. The case was tried to this Court on August 2, 3, 4 and 5, and post-trial memoranda were filed by the parties. This memorandum opinion constitutes the Court's findings of facts and conclusions of law.

### Facts

Plaintiff was a direct dealer for the sales and services of Chrysler and Plymouth motor vehicles and parts and accessories from 1946 to 1978. He operated his dealership as a sole proprietorship under the name "Somers-Kirby Motor Company," located in Pocomoke City, Maryland. The Chrysler-Plymouth direct dealer agreement in effect at all times relevant to this litigation is dated August 28, 1957 (P. Ex. 1). By separate agreement dated September 30, 1966, plaintiff became a direct dealer of Dodge motor vehicles and parts and accessories. (P. Ex. 3).[1] The provisions of the Chrysler-Plymouth direct dealer agreement and the Dodge direct dealer agreement pertinent to this litigation are identical.

The dealership's physical location consisted of a structure built in the 1940's, consisting of one building, 120 feet long by 40 feet wide, with a showroom and parts area and two service bay areas in the rear. The lot adjacent to the building could accommodate approximately 100 vehicles.

Defendant's sales operations were organized into geographic zones, each containing smaller districts. Each district had a district manager who dealt directly with dealers on behalf of Chrysler. At the times in question, Mr. Kirby's dealership was located within Chrysler's Eastern Shore District, which is part of Chrysler's Washington Zone. Mr. Kirby's district manager in 1976 and 1977 was Mr. Clayton Stokes and, in 1978, Mr. Lee Roe.

Pursuant to paragraph seven of the direct dealer agreements, Chrysler obligated Mr. Kirby to sell at retail on a calendar year basis a minimum number of Chrysler, Plymouth and Dodge cars and light trucks. Chrysler annually set the number of sales for the dealership, and this minimum number of vehicle sales was known as the dealership's "Minimum Sales Responsibility." Plaintiff's minimum sales responsibility was 134 new vehicles in 1976, 136 new vehicles in 1977, and 142 new vehicles in 1978. Plaintiff sold 184 new vehicles in 1976 and 142 new vehicles in 1977. Plaintiff terminated the dealership effective September 20, 1978.

Pursuant to the direct dealer agreements, plaintiff purchased new vehicles from defendant by submitting order forms for those vehicles. Defendant would normally not accept dealer initiated telephone orders for new vehicles. Paragraph ten of the direct dealer agreements provides that Chrysler would not ship vehicles to plaintiff unless he submitted an order for those vehicles.[2]

---

1. The parties to the direct dealer agreements were Somers-Kirby Motor Company, and Chrysler Motors Corporation. By virtue of the merger of Chrysler Motors Corporation into defendant Chrysler Corporation on December 31, 1975, defendant succeeded automatically to the position of Chrysler Motors Corporation in all outstanding agreements, including the direct

dealer agreements between plaintiff and Chrysler Motors Corporation.

2. Paragraph ten of the Chrysler-Plymouth direct dealer agreement stated, in pertinent part: "Chrysler-Plymouth agrees to ship Chrysler and Plymouth passenger cars and Chrysler and Plymouth passenger car parts and accessories to Direct Dealer only on Direct Dealer's order."

Since 1965, the purchase of new vehicles from Chrysler was financed, or "floor planned," through Chrysler Credit Corporation [hereinafter Chrysler Credit], a subsidiary of defendant. By virtue of a power of attorney given by plaintiff, Chrysler Credit Corporation would automatically pay defendant on behalf of plaintiff for all new vehicles, and would then place the vehicles on plaintiff's floor plan line of credit, unless for one or more reasons the line of credit was suspended or withdrawn. When a vehicle placed on plaintiff's floor plan of credit was sold to a customer, plaintiff was obligated to pay Chrysler Credit for the wholesale charges. Chrysler Credit billed the dealership monthly for wholesale finance charges.

In 1974, Mr. Kirby's dealership sold 168 new vehicles and earned a profit of $24,129.27. The following year, however, plaintiff's sales fell to 88 new vehicles, and the dealership recorded a loss of $11,440.00. In February 1976, Chrysler Credit placed the dealership on financial hold, a procedure where Chrysler Credit stopped the funding of purchases of new vehicles from Chrysler, because Mr. Kirby had sold seven vehicles to retail customers without repaying Chrysler Credit for the wholesale price of the vehicles. This was known as being "out-of-trust." Mr. Kirby was told that he could lose his dealership if he did not pay Chrysler Credit for the vehicles as to which he was out-of-trust. Chrysler Credit temporarily floor planned several of plaintiff's used vehicles, and plaintiff borrowed $48,000 and invested the proceeds into the dealership to pay Chrysler Credit. Plaintiff also hired Harry C. Williams as sales manager for the dealership in the hope that Williams would help plaintiff with his inventory and cash flow problems, and eventually buy into the dealership.

Vehicles for which plaintiff had not placed orders began arriving in the summer of 1976 during the 1976 model year build-out program. The build-out program is the period from May to September in which dealers attempt to sell their inventory of the outgoing model year vehicles, at a loss, if necessary, in order to make room for the new model year vehicles.

The sale of unordered vehicles was a common practice at this time in the Washington Zone. Mr. Robert C. Kackley, a Chrysler dealer during this period in Salisbury, Maryland, and competitor of plaintiff, was the representative for the nineteen dealers in the Salisbury District to the Washington Zone Dealer Council. The Washington Dealer Council was the representative body of Zone dealers which brought items of general dealer interest and concern to the attention of Chrysler's Washington Zone officials, with whom it met periodically. His uncontroverted testimony was that District Managers would telephone dealers from hotel rooms and put pressure on them to order vehicles from the Sales Bank. The Sales Bank was a pool of vehicles manufactured by defendant without dealers first submitting orders, and held in reserve on storage lots. Vehicles from the Sales Bank could be ordered without submitting a written order form. Typically, the vehicles in the Sales Bank were "dogs"—larger, harder to sell vehicles. The District Managers would refuse to fill orders from dealers for more popular models, or "kittens," unless the dealer agreed to order "dogs." Even if the dealer refused to order vehicles from the Sales Bank, they were delivered to his dealership and placed on his floor plan with Chrysler Credit. This practice was referred to as the "slugging" of vehicles.

Mr. Kirby testified that he occasionally agreed to purchase two or three vehicles from the Sales Bank over a two to three month period, but many other vehicles were delivered to him that he had not agreed to order. Because no contemporaneous records were kept, plaintiff does not know the total number of unordered vehicles that were delivered to him. He testified that twenty unordered vehicles were delivered in the summer of 1976. He further testified that unordered vehicles continued to arrive in the fall of 1976, and became a "real problem" in 1977. Plaintiff borrowed $20,000 in October and $25,000 in December of 1976, the proceeds of which were invested into the dealership.

In March 1977, at defendant's suggestion, plaintiff opened a second lot at a more accessible location. Despite plaintiff's complaints to Chrysler representatives, unordered vehicles continued to arrive throughout the year, and plaintiff continued to lose money. At one point, he became out-of-trust again, and he continued to borrow money and began selling personal assets. The proceeds were invested into the dealership, used to restructure existing loans, or to pay personal expenses of the Kirbys. On August 17, 1977, plaintiff tendered a letter cancelling the direct dealer agreements, effective September 16, 1977. Because the effective date of the termination fell within the 1978 model year, defendant was not obligated to repurchase plaintiff's inventory of 1977 model year vehicles. Plaintiff was, therefore, forced to withdraw the cancellation letter.

In February 1978, plaintiff became out-of-trust for a third time, and was again temporarily put on financial hold until he borrowed additional funds and paid Chrysler Credit the wholesale charges on those vehicles. On August 15, 1978, plaintiff tendered a second letter of cancellation to defendant, this one effective September 20, 1978, in time to obligate defendant to repurchase his inventory of 1978 vehicles.

Pursuant to the direct dealer agreements, Chrysler was obligated to repurchase Mr. Kirby's inventory of new vehicles by December 19, 1978. Chrysler did not repurchase those vehicles until January 15, 1979, and did not remove the last of them from plaintiff's lot until March, 1979. Upon being notified by Chrysler of the dealership termination, the State of Maryland required the surrender of Mr. Kirby's New-Car Dealer License as of November 30, 1978, effectively preventing plaintiff from selling vehicles subsequent to that date. He was assessed finance charges on 23 vehicles until February 28, 1979. Plaintiff refused to return a pick-up truck, which he retained as a set off for money he alleged Chrysler owed him as storage charges for the vehicles eventually repurchased by Chrysler.

*Applicable Law*

In this diversity case, this Court looks to the conflict of laws rules prevailing in Maryland. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The direct dealer agreements between Mr. Kirby and Chrysler provide that their terms are to be governed by the laws of Michigan. Maryland courts have adopted the rule that the parties to a contract may agree to the law which will govern their contractual rights and duties, provided the chosen state has a substantial relationship to the parties or the transaction or there is some other reasonable basis for the parties' choice, and provided that the law of the chosen state does not contravene a fundamental policy of the State of Maryland. *Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096 (1980). As there is no contention that Michigan lacks a substantial relationship to either the transaction or the parties, or that any of the applicable Michigan provisions contravene a fundamental policy of the State of Maryland, this Court will apply the substantive law of Michigan to this action.

Plaintiff contends that the provisions of the Uniform Commercial Code govern the direct dealer agreements. Article 2 of the U.C.C. "applies to transactions in existing or future goods...." Md. Com.Law Code Ann. § 2–102 (1975); Mich. Comp.Laws Ann. § 440.2102 (1967). Article 2 contains a four year statute of limitations provision, which applies to "[a]n action for breach of any contract for sale...." Md. Com.Law Code Ann. § 2–725 (1975); Mich. Comp.Laws Ann. § 440.2725 (1967). Defendant contends that this action is not governed by the provisions of the U.C.C., particularly the statute of limitations provision of § 2–725. Plaintiff relies on Maryland authority as support for his contention that the U.C.C. is applicable; defendant relies exclusively on a Michigan appellate decision as support for his claim that the provisions of the U.C.C. are not applicable. That presents the Court with a threshold issue as to whether, under Maryland conflicts of law principles, Maryland law or

Michigan law should be applied in determining whether the direct dealer agreements are properly characterized as contracts for sale, governed by the provisions of the Uniform Commercial Code, including § 2–725. Maryland courts have not addressed that issue, so this Court must apply a rule which it reasonably believes would be adopted by the highest Maryland court were it to rule on the question. *Uppgren v. Executive Aviation Services, Inc.,* 326 F.Supp. 709, 711 (D.Md.1971).

Those courts that have reached this issue have applied the law of the forum in determining whether an agreement should be considered a contract for sale under the U.C.C. In *Warner Motors v. Chrysler Motors Corp.,* 5 U.C.C.Rep. 365 (E.D.Pa.1968), the Court was faced with the same issue present in the instant case, that of whether the four-year statute of limitations provision contained in § 2–725 of the U.C.C. was applicable to a Chrysler direct dealer agreement. In holding that the dealer agreement was a contract for sale within the meaning of § 2–725, the Court relied on a decision of the Supreme Court of Pennsylvania. Similarly, in *Parrish v. B.F. Goodrich Company,* 46 Mich.App. 85, 88, 207 N.W.2d 422 (1973), the Michigan Court of Appeals applied the law of the forum to the issue of whether the contract in question there was a contract for sale, expressly holding that characterization of actions should be made in accordance with the law of the forum. Those cases are consistent with the approach generally applied to the characterization process. *See* Leflar, *American Conflicts Law,* § 87 (3d ed. 1977); 16 Am.Jur.2d, *Conflicts of Laws,* § 3, pp. 8–10. This Court concludes that Maryland courts would apply Maryland law in deciding whether the direct dealer agreements are governed by the provisions of the Uniform Commercial Code.

In determining whether a contract, like direct dealer agreements, are covered by the U.C.C. provisions as a sales contract, Maryland has adopted the following test:

The test for exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service with goods incidentally involved.... or is a transaction of sale, with labor incidentally involved.

*Burton v. Artery Co.,* 279 Md. 94, 108–09, 367 A.2d 935, 943 (1977), quoting *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974). Applying that test, this Court concludes, as did the Court in *Warner, supra,* that the direct dealer agreements are contracts for sale within the meaning of § 2–725 of the Uniform Commercial Code. Although there are nonsale aspects to the agreements, their primary thrust, indeed their stated purpose, was "to promote the sale of Chrysler and Plymouth [or Dodge] products." (P. Exs. 1 and 3). Not only did the agreements contemplate the sale of Chrysler vehicles and parts and accessories, they obligated Mr. Kirby to sell a minimum number of Chrysler, Plymouth and Dodge cars and light trucks, the dealership's Minimum Sales Responsibility (P. Ex. 1, ¶ 7, and P. Ex. 3, ¶ 7). If plaintiff's sales fell below his Minimum Sales Responsibility, defendant could terminate the dealership (P. Ex. 1, ¶ 10 and P. Ex. 3, ¶ 10). Inasmuch as Mr. Kirby had obligated himself to meet the quotas set by defendants for the retail sale of its vehicles, vehicles that he would purchase from defendant, this Court concludes that the predominant purpose of the agreement was the sale of Chrysler vehicles. In doing so, the Court notes that a clear majority of courts that have reached the issue have held that distributorship or franchise agreements are governed by the provisions of the Uniform Commercial Code. *See Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129 (5th Cir.1979) (refrigerator distributorship agreement); *Aaron E. Levine & Co. v. Calkraft Paper Co.,* 429 F.Supp. 1039 (E.D. Mich.1976) (paper products distributorship; applying Michigan law); *Warner Motors, Inc. v. Chrysler Motors Corp.,* 5 U.C.C.Rep. 365 (E.D.Pa.1968) (Chrysler dealership); *Artman v. International Harvester Co.,* 355 F.Supp. 482 (W.D.Pa.1973) (truck distribution franchise); *M.J. McCarthy Motor Sales*

*Co. v. Van C. Argiris & Co.,* 78 Ill.App.3d 725, 33 Ill.Dec. 529, 396 N.E.2d 1253 (1979) (automobile dealership); *Warrick Beverage Corp. v. Miller Brewing Co.,* 170 Ind.App. 114, 352 N.E.2d 496 (1976) (beer distributorship agreement); *Leibel v. Raynor Mfg. Co.,* 571 S.W.2d 640 (Ky.App.1978) (garage door dealer-distributorship agreement); *Division of Triple T. Service Inc. v. Mobil Oil,* 60 Misc.2d 720, 304 N.Y.S.2d 191 (1969), *aff'd* 34 App.Div.2d 618, 311 N.Y.S.2d 961 (gas station franchise agreement); *Mastrian v. William Freihofer Baking Co.,* 45 Pa.D. & C.2d 237, 5 U.C.C.Rep. 988 (1968) (baked goods distributorship agreement); *Quality Performance Lines v. Yoho Automotive, Inc.,* 609 P.2d 1340 (Utah 1980) (automotive components distributorship agreement); *Meuse-Rhine-Ijssel Cattle Breeders of Canada, Inc. v. Y-Tex Corp.,* 590 P.2d 1306 (Wyo.1979) (cattle semen exclusive dealing contract). *See generally* Annot., 4 A.L.R. 4th 85 (1981).

Moreover, even were this Court to hold that the characterization of this action should be made in accordance with Michigan law, it would still conclude that the direct dealer agreements were governed by the provisions of the Uniform Commercial Code. Although the Michigan Court of Appeals recently declined to either adopt or reject the predominant purpose test applied by Maryland and other courts, *see H. Hirschfield Sons, Co. v. Colt Industries Operating Corp.,* 107 Mich.App. 720, 309 N.W.2d 714 (1981), at least one court has applied the Uniform Commercial Code as adopted by Michigan to a franchise agreement, ruling that the agreement at issue was a transaction in goods within the meaning of § 2–201. *Aaron E. Levine & Company, Inc. v. Calkraft Paper Co.,* 429 F.Supp. 1039, 1048 (E.D.Mich.1976).

Nor does this Court read the decision of the Michigan Court of Appeals in *Lorenz Supply Co. v. American Standard, Inc.,* 100 Mich.App. 600, 300 N.W.2d 335 (1981), the case upon which defendant relies, as compelling a different result.

In *Lorenz,* the Court held that the U.C.C. did not apply to a distributorship agreement for the sale of plumbing fixtures. The Court stated:

> To summarize these provisions, the Code applies to a present sale of existing and identified goods or to a contract where the parties agree to the sale of goods at a future time. In the instant case, Lorenz was granted the status of a "preferred distributor" who would be entitled to purchase plumbing fixtures manufactured by the defendant in the future. *The agreement did not require Lorenz to buy a certain quantity of goods or, indeed to buy any goods from the defendant in the future.* This agreement envisioned an ongoing economic relationship between Lorenz and defendant for their mutual benefit, rather than a contract of sale.

300 N.W.2d at 338. (emphasis added). The Court noted that the parties had entered into a separate agreement for the sale of plumbing inventory. In contrast to the situation that existed in *Lorenz,* the sales and nonsales aspects of the relationship between plaintiff and defendant were contained in the same agreements. As previously noted, plaintiff not only bargained for the right to distribute Chrysler vehicles and parts, he obligated himself to sell at retail and therefore to purchase from Chrysler a minimum number of vehicles annually. Moreover, the principal breach alleged concerned the actual sale of specified vehicles from defendant to plaintiff. Therefore, the Court concludes that the provisions of Article 2 of the Uniform Commercial Code apply to the Chrysler direct dealer agreements, including the statute of limitations provisions contained in § 2–725, whether Maryland law or Michigan law is applied to the characterization issue. Since Maryland and Michigan have identical statute of limitations provisions, there is no choice-of-law requirement as to which provision should be applied. Leflar, *American Conflicts Law* § 102 at 239 (1968).

This action was commenced on October 16, 1980. Defendant argues that even if the four year statute of limitations is applicable to this action, plaintiff's claims for damages resulting from alleged delivery

of unordered vehicles prior to October 16, 1976, are barred by limitations. For statute of limitations purposes, a cause of action accrues when the breach occurs. Mich. Comp.Laws Ann. § 440.2725(2) (1975). In the case of an installment contract,[3] a buyer may not repudiate the contract unless there is a breach of the whole contract, which occurs when a defect with respect to one or more installments substantially impairs the value of the whole contract. Mich.Comp. Laws Ann. § 440.2612(2) (1975). Plaintiff argues that his cause of action did not accrue until there was a breach of the whole contract, and alleges that that did not occur until August 17, 1977, when the cumulative effect of defendant's delivery impaired the value of the whole contract, as evidenced by plaintiff's first notice of cancellation on that date.

█ Although plaintiff may not have been entitled to cancel the whole contract as a result of defendant's alleged breaches[4] until August 1977, he presumably could have brought an action before that date for damages sustained as a result of past deliveries of unordered vehicles. Nevertheless, since plaintiff chose to terminate the contract and bring this action on the theory that there was a breach of the whole contract, his cause of action accrued, for statute of limitation purposes, at the point at which delivery of vehicles impaired the value of the whole contract. *Cf. Worrel v. Farmers Bank of the State of Delaware,* 430 A.2d 469 (Del.Sup.Ct.1981). (Creditor's delinquency action for breach of installment sales agreement accrues, not at time of initial breach, but from date of creditor's exercise of its option to declare debtor's whole obligation immediately due). Even if

this Court were to hold that plaintiff's claim is barred as to deliveries made prior to October 16, 1976, defendant presented no evidence as to which, if any, of the 77 vehicles identified by plaintiff as unordered, were delivered before that date.[5]

█ Defendant's delivery of vehicles for which plaintiff had not placed a written or oral order constituted a breach of the direct dealer agreements. Defendant contends that plaintiff is barred from any remedy he might otherwise have because he accepted the vehicles. That is plainly not the case. Michigan's version of the Uniform Commercial Code relating to acceptance of goods by a buyer provides, in pertinent part:

> (2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but *acceptance does not of itself impair any other remedy provided by this article for nonconformity.*

[Mich.Comp.Laws Ann. § 440.2607(2) (1967) (emphasis added).] Those remedies include damages resulting from defendant's breaches, provided the buyer "within a reasonable time after he discovers or should have discovered any breach [notifies] the seller of breach...." Mich.Comp.Laws Ann. § 440.2607 (1967). The U.C.C. Comment to that section explains that "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched."

---

3. Since the direct dealer agreements provide for the delivery of vehicles in separate lots, they are installment contracts. Mich.Comp. Laws Ann. § 440.2612(1) (1975).

4. Pursuant to paragraph 21 of the dealership agreements, plaintiff was entitled to terminate those agreements for any reason, so long as he gave Chrysler at least thirty days notice. (P.Exs. 1 and 3).

5. Plaintiff submitted order forms and invoice notices for a portion of the vehicles delivered to

him from 1976 to 1978. Some of those invoices are dated August or September 1976, but there is no indication as to when the vehicles were actually delivered to plaintiff. Kackley testified that, as to ordered vehicles, there could be a delay of as much as two months between the placing of the order and the actual delivery of the vehicle to the dealer. In the absence of any evidence as to the experience with unordered vehicles, this Court will not speculate as to when tender of delivery of those vehicles was made.

The evidence showed that Mr. Kirby complained on numerous occasions by telephone and in person to his District Manager, Mr. Stokes, and also complained to Mr. Mel Hewins, the Washington Zone Manager. In addition, Mr. Kackley testified that Mr. Kirby repeatedly voiced his complaints to him, which, along with complaints of other dealers, were communicated to Chrysler representatives at Dealer Council Meetings. (*See* P. Exs. 338–340). Although Mr. Kirby never made any written complaints, it is plain that oral notice is sufficient. *Steel & Wire Corp. v. Thyssen, Inc.,* 20 U.C.C.Rep. 892 (E.D.Mich.1976). The Court finds as a fact that plaintiff's repeated complaints to Chrysler officials were sufficient to put Chrysler on notice that the transactions between the parties were "troublesome and must be watched." Therefore, the Court rules that plaintiff did not waive his remedy of damages by accepting the unordered vehicles.

### Damages

Having complied with the notice provision of § 2–607(3), Mr. Kirby "may recover as damages for any non-conforming tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Mich.Comp.Laws Ann. § 440.2714(1) (1967). Non-conformity under Section 2–714 means any failure of the seller to perform according to his obligations under the contract. Mich.Comp.Laws Ann. § 440.-2714, Comment 2 (1967). In addition, in a proper case any incidental and consequential damages may also be recovered under Section 2–714(3). Incidental damages include any "reasonable expense incident to the ... breach," and consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented ...," Mich.Comp. Laws Ann. § 440.2715(1) & (2) (1967).

Plaintiff argues that under Michigan contract law, any doubts that exist as to the certainty of damages should be resolved against the party causing the injury. However, it is Maryland law that controls as to the burden of proof, the inferences to be drawn from the evidence, and the sufficiency of the evidence presented on a particular issue. *See Joffre v. Canada Dry, Inc.,* 222 Md. 1, 158 A.2d 631 (1960). Under Maryland law, the plaintiff has the burden of proving the fact of and the extent of the damages he has sustained. Those damages must be proved with reasonable certainty, and may not be based on speculation or conjecture. *Lazorcak v. Feuerstein,* 273 Md. 69, 327 A.2d 477 (1974); *Charles County Broadcasting Company, Inc. v. Meares,* 270 Md. 321, 311 A.2d 27 (1973).

Plaintiff contends that he incurred substantial finance charges and increased overhead on the unordered vehicles delivered to him. He further alleges that he was forced to take a loss on the sales of vehicles in an effort to reduce his inventory. During this period, he took out several loans and sold personal assets, allegedly to cover the losses incurred as a result of the slugging of vehicles. He estimates that the value of the personal assets sold, the principal amount of capital loans remaining unsatisfied at termination, and the interest paid on one of those loans total $221,887.03. He claims that sum as the damages to which he is entitled as the result of defendant's pre-termination breaches.

Although lost capital expenditures may be a proper measure of damages in an appropriate case, the Court concludes that plaintiff has failed to prove that these investment losses are attributable to defendant's breaches of the direct dealer agreements. Assuming, *arguendo,* that the $221,887.03 figure represents the true extent of plaintiff's losses for the period,[6] the

---

**6.** Evidence presented at trial indicated that that figure may well overstate plaintiff's losses. For one thing, portions of the funds borrowed by plaintiff, for example, a portion of the proceeds of the loans taken out on February 24, 1977, and June 1, 1977, were spent to meet personal expenses of the Kirbys, rather than invested into the dealership or used to refinance previous loans (P.Ex. 353; Testimony of Mrs. Kirby). In addition, Mrs. Kirby admitted

Court concludes that plaintiff failed to prove that this loss can be attributed to the slugging of vehicles by defendant. Plaintiff relies on the testimony of the Kirbys that they could have made the dealership profitable again had defendant not delivered unordered vehicles to plaintiff or had discontinued the practice after plaintiff's complaints, and further relied at trial on a February 28, 1977 memorandum written by an official with Chrysler Credit which stated the writer's opinion that plaintiff's decision to open a new lot could "go a long way in improving his total sales penetration...." (P. Ex. 30). However, the Court finds this evidence unpersuasive in light of the losses sustained by the dealership before the arrival of unordered vehicles, and the extent of plaintiff's claimed losses. As previously stated, plaintiff's dealership lost money in 1975. The precarious financial condition of the dealership is evident from the fact that in February of 1976, before the arrival of the first unordered vehicle, plaintiff was out-of-trust on seven vehicles, forcing him to borrow $48,000 to pay off Chrysler Credit. Although he claims that this infusion of funds would

have made the dealership profitable again had Chrysler not begun delivering unordered vehicles, he was forced to borrow an additional $45,000 before the end of the year (P. Ex. 353), and the dealership lost over $30,000 that year, despite the fact that the "slugging" of vehicles did not become a serious problem until 1977.[7] The fact that plaintiff lost money in both 1975 and 1976, and had borrowed over $90,000 by the end of 1976 is strong evidence that the dealership was encountering serious difficulties unrelated to the delivery of unordered vehicles.

This Court is not persuaded that the exhibit upon which plaintiff relies, a memorandum from Mr. Donald A. Ziegler, the Branch Manager of Chrysler Credit, to his Zone Manager, stating Ziegler's belief that Mr. Kirby's decision to open a second lot would improve sales, is proof that the dealership would have become profitable again had Chrysler discontinued the delivery of unordered vehicles. Despite the opening of the new lot, sales of new vehicles declined from 184 in 1976 to 142 in 1977.[8] Lee Roe, Chrysler's District Manager in 1978, opined in a report dated May 16, 1978 that plaintiff

on cross-examination that a portion of sums listed on the dealership books as "withdrawals," which she had testified on direct examination represented the money taken from the dealership to make payments on outstanding loans, was actually used to meet the Kirbys' personal expenses. Finally, to the extent that proceeds of loans now claimed as damages were used to make the interest payments also claimed by plaintiff, it would allow plaintiff a double recovery if he were permitted to recover both of those "losses" as elements of his damages. Therefore, although the Court found credible the testimony of Mrs. Kirby that the amount of money withdrawn for living or other personal expenses from loan proceeds and from the dealership itself during this period was kept to a minimum, the accounting practices employed by Mrs. Kirby do cast doubt on the accuracy of the $221,887.03 figure claimed by plaintiff.

7. Plaintiff testified that 20 unordered vehicles arrived in the summer of 1976, and an undisclosed number were delivered in the fall, although he testified that it was not a bad problem in the fall. Mrs. Kirby testified that the delivery of unordered vehicles was a problem "in a small way" in the summer of 1976, and that Mr. Kirby only "complained a little" about

it in 1976. She testified on cross examination that the arrival of unordered vehicles was not a problem in 1976, that it became a problem only at the end of the year. Indeed, the conclusion that the slugging of vehicles did not become a serious problem until 1977 is consistent with plaintiff's argument that that practice did not impair the value of the direct dealer agreements, for statute of limitations purposes, until August 1977.

8. The Court finds it significant that subsequent to the opening of the new lot, a move plaintiff contends would have otherwise contributed to making the dealership profitable again, new vehicle sales apparently fell. Although the slugging of vehicles contributed to increased overhead and finance charges, there was no evidence to indicate that it would result in decreased sales. Indeed, the testimony was just the opposite, that Mr. Kirby would sell vehicles at a loss in order to reduce his burgeoning floor planning charges. Therefore, the decrease in sales is more likely attributable to plaintiff's ineffective sales and marketing techniques, or what plaintiff characterized in explaining losses for 1975 as poor market for Chrysler vehicles.

needed a more aggressive sales manager, and needed to be more attentive to the monitoring of his business. (D. Ex. 66)..

■ The Court finds that, although the delivery of unordered vehicles certainly exacerbated the dealership's financial problems, that practice began and became a serious problem at a time when plaintiff was already losing substantial sums of money. None of the evidence presented at trial persuades this Court that but for the continued delivery of unordered vehicles, plaintiff would have made the dealership profitable again. This conclusion is reinforced by the magnitude of the losses plaintiff is claiming. As will be discussed later in this Memorandum Opinion, the loss that can be attributed to the sale of the 77 unordered vehicles identified by plaintiff, even where overhead expenses are apportioned, and finance charges and the profit or loss resulting from the resale of used cars taken as trade-in is considered, totaled $58,697.72. Even assuming twice that number of unordered vehicles were delivered to plaintiff, and the losses sustained on those vehicles were comparable to the losses sustained on the vehicles identified by plaintiff, that still would not account for the magnitude of the losses that plaintiff has claimed.[9] Therefore, the Court concludes that plaintiff's lost investment, or unreimbursed expenses, is an inappropriate measure of damages.

Plaintiff and his wife did not keep a contemporaneous record of the vehicles that were delivered for which plaintiff placed no orders. In 1978, the Kirbys were able to compose a partial list of the unordered vehicles sold to them by examining the order numbers contained on the invoices for vehicles delivered to the dealership files. If the dealership did not have an order form for that vehicle, Mrs. Kirby determined that they had not ordered it. In answer to a question posed by the Court, she testified that her list of unordered vehicles did not include the vehicles plaintiff voluntarily ordered from the Sales Bank. John Surma, an Audit Field Sales Representative employed by Chrysler, performed an audit analysis on the Somers-Kirby dealership. After examining plaintiff's and defendant's files, he was able to verify that the order forms for the 77 vehicles identified by plaintiff were unsigned. He testified that, based upon his investigation, he could not refute plaintiff's claim that the 77 vehicles were unordered.[10]

Mr. Surma then traced the sales experience of each of the 77 vehicles in order to determine the losses, if any, sustained by plaintiff on those vehicles. He determined that, after deducting the floor plan interest charges on each unit, Mr. Kirby made a net profit of $3,624 on the resale (or repurchase by Chrysler at termination) of those vehicles. (D. Ex. 328). That figure did not take into account any increased overhead expenses that may be attributed to the arrival of the unordered vehicles, nor the profit or loss Mr. Kirby experienced on the

9. It is true that, in an appropriate case a plaintiff may recover as damages expenditures made in the attempt to avoid losses even where those expenditures have increased those losses. 5A Corbin, *Corbin on Contracts* § 1044 (1964). However, from the evidence presented, the Court finds that the reason plaintiff arguably sustained losses in excess of $220,000 is that there were other factors independent of the delivery of unordered vehicles which caused plaintiff to lose money, not that $221,887.03 was lost in an unsuccessful attempt to avoid losses occasioned solely from the slugging of vehicles.

10. Defendant points out that two other order forms for vehicles plaintiff admits to have ordered are not signed by plaintiff (P.Exs. 123, 179). Since plaintiff identified unordered vehicles, defendant claims, as those vehicles whose order forms did not contain his signature, defendant suggests that the list of 77 allegedly unordered vehicles may contain vehicles that were in fact ordered by plaintiff. Mr. Kirby did testify at one point that if an order form was not signed by him, that would indicate he had not ordered the car. However, Mrs. Kirby testified that she made the determination that a vehicle was unordered not by checking to see if Mr. Kirby had signed the order form, but by checking the dealership files to see if they had retained a copy of the order blank. Significantly, Chrysler presented no affirmative evidence that any of the 77 vehicles identified by plaintiff as having been unordered had been ordered by plaintiff.

resale of used vehicles he had accepted as trade-in on the retail sales of the 77 unordered vehicles. Mr. Kirby had testified that in order to entice customers to purchase the unordered vehicles, so that he could reduce his inventory of new cars and the floor plan charges accompanying them, he "over-allowed," or gave more for used vehicles taken in trade than those vehicles were actually worth. Because these factors were not taken into account, the $3,624 profit figure does not accurately reflect the true sales experience on those vehicles.

■ Mr. Surma performed a second study, which took into account the vehicles' selling expenses, the results of sales of used car trade-ins and the application of a pro rata share of the dealership overhead to each vehicle.[11] When those expenses are included, he determined that the dealership experienced a net loss of $36,156 on the 77 identified vehicles, exclusive of floor plan finance charges (P. Ex. 349, 350). Mrs. Kirby testified that she had determined that the dealership had paid $22,541.72 in finance charges on the 77 unordered vehicles. Defendant contends that plaintiff is entitled to $7,973.53, a figure computed by Mr. Surma. (See P. Ex. 349). However, Mr. Surma testified that that figure represented interest paid to Chrysler Credit on the unordered vehicles repurchased by Chrysler after termination, not on all 77 unordered vehicles. In fact, Mr. Surma estimated that the total floor plan financing charges for the 77 vehicles was $22,519 in his Summary of New Vehicle Gross Profit (Loss) report, a figure within $23 of the total reached by Mrs. Kirby. (D. Ex. 328). The Court finds Mrs. Kirby's testimony credible and finds as a fact that the finance charge on the 77 unordered vehicles totalled $22,541.72.

Plaintiff also claims the rent on the second lot opened in 1977 and the salary of Mr. Williams, plaintiff's Sales Manager, as additional elements of damages. Mr. Williams was hired before the arrival of unordered vehicles, and there was no credible evidence presented to suggest that had it not been for the slugging of vehicles, plaintiff would not have opened the second lot. Therefore, rather than claiming that these expenses were incurred as a result of defendant's breaches, plaintiff argues, instead, that these expenses were made worthless by Chrysler's breaches. As previously stated, the Court concludes that defendant's breaches were a contributing factor, but not the sole cause of plaintiff's losses. To the extent that Mr. Williams' salary and the rent on the second lot were considered in Mr. Surma's pro rata assignment of selling and overhead costs to the 77 unordered vehicles, plaintiff will receive a portion of those expenses as damages. The Court concludes that plaintiff is not entitled to recover those expenses in full.

■ Mr. and Mrs. Kirby testified that unordered vehicles, in addition to the 77 which they were able to identify, were delivered to the dealership. Mr. Kirby admitted, however, that he did not know how many more vehicles were delivered. No contemporaneous record was kept when unordered vehicles arrived. Because there was no evidence presented indicating with any degree of accuracy the number of unordered vehicles delivered to the dealership, and no evidence calculating the sales experience of those vehicles, any damages awarded for unordered, yet unidentified vehicles would be impermissibly based on speculation and conjecture. Plaintiff's

11. Defendant disputes the propriety of assigning a pro rata share of overhead to each vehicle. It argued that several overhead figures such as heat, rent, and electricity, would be the same regardless of the number of cars kept on plaintiff's lot. Plaintiff, on the other hand, points to the dramatic increase in the overhead expenses during this period, and to the fact that shortly after the unordered vehicles began arriving in large numbers, he found it necessary to open a second lot, suggesting that a pro rata apportionment of overhead expenses might understate the impact of unordered vehicles. However, no estimates have been made as to the marginal increase in overhead expense that was caused by the arrival of the unordered vehicles. In the absence of any reliable evidence as to the actual overhead expenses attributable to the 77 identified vehicles, this Court concludes that assigning a pro rata share of overhead to each vehicle is a reasonable measure of damages.

award will be limited to the losses incurred on the 77 identified vehicles.

■ Defendant argues that plaintiff should not be entitled to recover even those damages because those losses could have been minimized or avoided altogether had plaintiff refused to accept the vehicles, placed the dealership on voluntary financial hold, or taken affirmative steps to receive reimbursement for finance charges he had paid. The Court disagrees.

First, Mr. Kackley testified that he attempted to refuse delivery of unordered vehicles when they arrived at his dealership, but Chrysler officials would call and insist that he had ordered those vehicles. He stated that he was told that he must accept the vehicles or be put on financial hold. Indeed, R.L. Hansen, the Sales Planning and Distribution Manager for Chrysler, stated in a notice directed to Chrysler dealers, that unordered vehicles should be accepted by dealers. He warned that if the vehicles were rejected and returned, dealers would continue to incur finance charges, and Chrysler would refuse to buy back those vehicles. (P. Ex. 63). In light of that policy, plaintiff's actions in accepting the unordered vehicles that were delivered to him were reasonable.

The Court is also persuaded that Mr. Kirby was justified in not going on voluntary financial hold in an effort to prevent the delivery of unordered vehicles. The purported rationale for going on financial hold is that a dealer on voluntary financial hold could prevent Chrysler Credit from paying for vehicles Chrysler attempted to sell to the dealer unless the dealer approved the payment. Presumably, a dealer could in that way authorize payment on all ordered vehicles, and refuse payment on all unordered vehicles. However, Mr. Kackley testified that he was told that he could not go on selective financial hold as to unordered vehicles. He would have to go on financial hold as to all of his vehicles, or not at all. Both he and Mr. Kirby testified that a dealer on financial hold who wanted to order a vehicle would have to submit a letter to Chrysler Credit, pay a $30 assessment,

and typically wait thirty days for delivery of the vehicle. That delay frequently could lead to a lost sale, as a customer unwilling to wait that long would go elsewhere to purchase a vehicle. Kirby decided to accept the vehicles and sell them as quickly as possible, rather than risk losing sales by placing himself on financial hold. The Court finds that decision to be a reasonable one.

Finally, the Court is not persuaded that Kirby could have mitigated his damages further by more diligently attempting to get Chrysler to repurchase vehicles and repay him for finance charges on those vehicles. Mr. Kirby testified that he was not notified of a program Chrysler had instituted for repurchasing unordered vehicles and reimbursing dealers for finance charges, despite the fact that he repeatedly complained about the practice of delivering those vehicles to the dealership. Kackley testified that he learned of a procedure whereby Chrysler would repurchase unordered vehicles, but explained that it would take six to eight letters and "up to or over a year" before Chrysler would repurchase the vehicles, and that it would take even longer to get reimbursed for the interest paid. In the meantime, the vehicle remained on the dealer's floor plan. As a result, a dealer might be unable to order a vehicle he needed because his floor plan was taken up by unordered vehicles. Plaintiff had put defendant on notice on numerous occasions that he did not want to keep the vehicles that he had not ordered. He was not required to stockpile unordered vehicles while he initiated the lengthy and cumbersome process of arranging for defendant to repurchase those vehicles. Plaintiff is entitled to recover the $58,697.72 that he lost on the sale of identified unordered vehicles.

■ Plaintiff also seeks damages for Chrysler's alleged breach of the direct dealer agreements' provisions governing termination procedures. (P. Ex. 1, ¶ 21; P. Ex. 3, ¶ 21). Pursuant to those provisions, Chrysler was obligated to purchase the dealership's inventory of new vehicles by December 19, 1978. It did not repurchase those

vehicles until January 15, 1979, and did not remove them from plaintiff's lot until as late as March, 1979. Plaintiff continued to pay wholesale financing charges on 23 vehicles until February 28, 1979. Mr. Kirby continued to sell vehicles until November 30, 1978; therefore he seeks only finance charges and storage charges from December 1, 1978 until he no longer had to pay financing charges and until the vehicles were finally picked up by Chrysler.

Plaintiff was unable to sell vehicles after November 30, 1978 because the Maryland Department of Motor Vehicles directed him to surrender his New-Car Dealer License and to cease selling those vehicles. Although that action was taken as a result of Chrysler's notification to the Department of Motor Vehicles that Mr. Kirby was no longer a Chrysler dealer, that notification to the Department was certainly not wrongful. Defendant was not required to repurchase any vehicles until December 19, 1978, so plaintiff is entitled to damages in the form of finance and storage charges from that date only. The finance charges from December 31, 1978 to February 28, 1979 totaled $823.17 on the 23 repurchased vehicles (D. Ex. 321). The finance charges for December 1978 were $1,538.29, of which plaintiff is entitled to $\frac{12}{31}$, or $595.37. Thus, the total finance charges from December 19 to February 28, 1979 were $1,418.54.

Plaintiff charged defendant $3 per day per vehicle for storage of those vehicles on his lot until the vehicles were removed by Chrysler representatives. The bill for storage that he submitted to defendant totalled $6,276 (P. Ex. 105). Plaintiff testified without contradiction that he arrived at that figure based upon his experience as a car dealer, and cited as an example of customary rates in the area, the fact that a finance company would charge $5 per car per day. The Court finds that plaintiff is entitled to a reasonable storage charge for vehicles which were not repurchased by Chrysler by December 19 and finds further that a $3 per vehicle per day charge is reasonable. After deducting plaintiff's charges for the period December 1, 1978 to December 19, 1978, plaintiff is entitled to $4,965 in storage charges.

The vehicles repurchased by defendant included a 1978 Dodge pick-up truck valued at the time of repurchase at $5,344.61. Plaintiff removed that vehicle to his home, and refused to deliver it to defendant until it paid the storage charges assessed by plaintiff on the repurchased vehicles. Defendant has counterclaimed for that amount. Judgment will be entered in favor of defendant on its counterclaim for that amount.

In conclusion, this Court finds that plaintiff is entitled to damages caused by defendant's slugging of vehicles in the sum of $36,156, in addition to $22,541.72 for finance charges. The Court also finds that plaintiff is entitled to $4,965 in storage charges and $1,418.54 in finance charges caused by defendant's failure to repurchase 23 vehicles from plaintiff within 90 days of the effective date of termination of the direct dealer agreements. Finally, the Court finds that defendant is entitled to recover the value of the pick-up truck that it repurchased from plaintiff, but which was never returned to defendant. A separate judgment will be entered accordingly.

## ORDER

For the reasons set forth in the foregoing Memorandum, it is, this 20th day of December, 1982 by the United States District Court for the District of Maryland, hereby

ORDERED:

1. That judgment be entered in favor of plaintiff/counter-defendant, E. Lester Kirby, Individually and trading as Somers-Kirby Motor Company, on its claims against defendant/counter-plaintiff, Chrysler Corporation, for the sum of $65,081.26.

2. That judgment be entered in favor of defendant/counter-plaintiff, Chrysler Corporation, on its counterclaim against plaintiff/counter-defendant E. Lester Kirby, Individually and trading as Somers-Kirby Motor Company, for the sum of $5,344.61.